IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

PATRICK SMITH,

Petitioner.

Criminal No.:  ELH-18-017
Related Civil No.: ELH-20-2609

**MEMORANDUM OPINION**

This Memorandum Opinion considers a post-conviction petition filed by the self-represented Petitioner, Patrick Smith, pursuant to 28 U.S.C. § 2855.  ECF 756; ECF 847; ECF 891.[1]  Smith, one of 18 defendants in the underlying case, entered a plea of guilty in May 2019 to one count of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin.  ECF 562.  Pursuant to Smith's Plea Agreement (ECF 563), tendered under Fed. R. Civ. P. 11(c)(1)(C), Smith was sentenced to the agreed upon term of ten years' imprisonment.  ECF 645.  That sentence corresponds to the congressionally mandated minimum sentence.  Smith asserts a wide variety of complaints concerning his case.

The government opposes the petition.  ECF 809 (the "Opposition"); ECF 921 (the "First Supplemental Opposition").  Smith has replied.  ECF 843; ECF 938; ECF 939.

In addition, Smith has moved six times to amend the petition.  ECF 919; ECF 978; ECF 1003; ECF 1008; ECF 1020; ECF 1022.  With one exception, the government opposes these amendments.  ECF 921; ECF 1031 (the "Second Supplemental Opposition").  Because I shall grant

---

[1] An attorney entered an appearance for Smith in July 2020 (ECF 722), apparently only in connection with a motion for compassionate release, filed under 18 U.S.C. § 3582(c)(1)(A)(i).  *See* ECF 723.  I denied that motion by Memorandum Opinion (ECF 911) and Order (ECF 912) of March 1, 2021.  By Memorandum Opinion (ECF 1013) and Order (ECF 1014) of December 23, 2021, I also denied Smith's pro se renewed motion for compassionate release (ECF 917, ECF 965).

the motions to amend, I shall refer to ECF 756; ECF 847; ECF 891; ECF 919; ECF 978; ECF 1003; ECF 1008; ECF 1020; and ECF 1022 collectively as the "Petition."  Smith has submitted various exhibits in connection with the Petition.

Much of Smith's argument relates to a codefendant, whom Smith asserts has cooperated with the government.  For that reason, the government moved to seal certain documents filed by Smith.  *See* ECF 934; *see also* ECF 935 (Order granting sealing motion).  But, the government did not move to seal all documents in which Smith identifies the asserted cooperating defendant.  I will refer to this individual as "Coconspirator 1," which corresponds to the terminology used in Smith's Plea Agreement.  *See* ECF 563 at 10.

Smith has also filed several other motions.  These include a motion to subpoena certain witnesses for an evidentiary hearing (ECF 930); a "Motion for Oral Argument at 2255 Hearing" (ECF 931); a "Motion for Evidentiary Hearing on Smith's 2255 Motion" (ECF 932); and a motion seeking this Court's recusal regarding the Petition.  ECF 933 (the "Recusal Motion").[2]

No hearing is required to resolve the Petition or the motions.  For the reasons that follow, I shall deny the Petition.  And, I shall deny the Recusal Motion (ECF 933) as well as the hearing requests (ECF 931; ECF 932).

## I. Recusal Motion

Smith's Recusal Motion is premised on 28 U.SC. § 455 and, in particular, § 455(a).  Under § 455, the judge whose objectivity is being challenged by a motion to recuse is the one who first

---

[2] Smith recently filed a "Motion for Emergecy [sic] Injunction Requesting This Court to Order the United States Attorney's Office to Order the Transfer of Smith and the Return of Smith's Law & Legal Materials." ECF 1043. Based on the content of this filing, it was more accurately characterized as a claim under 42 U.S.C. § 1983 relating to conditions of confinement. As such, a new case has been opened for this filing, and assigned to Judge Deborah K. Chasanow. *See* DKC-22-918.

reviews the matter concerning disqualification.  Indeed, under Rule 4(a) of the Rules Governing §

2255 Proceedings, "the judge who conducted the trial and imposed sentence" is generally the

"appropriate judge" to consider the merits of any post-conviction complaints.  Assigning the matter

to the original judge is "highly desirable" because she is the one "who is familiar with the facts

and circumstances surrounding the trial, and is consequently not likely to be misled by false

allegations as to what occurred."  *Id*., Rule 4, Advisory Committee Note.

Section 455(a) of 28 U.S.C. focuses on the appearance of impropriety.  It states: "Any

justice, judge, or magistrate judge of the United States shall disqualify [herself] in any proceeding

in which [her] impartiality might reasonably be questioned."  The term "proceeding" in § 455

includes the usual stages of a criminal trial and appellate review, as well as "other stages of

litigation." 28 U.S.C. § 455(d)(1).  The test "embodies an objective standard" and asks "whether

an objective, disinterested, lay observer fully informed of the facts ... would entertain a significant

doubt about a judge's impartiality.  *Parker v. Connors Steel Co*., 855 F.2d 1510, 1524 (11th Cir.

1988).  The provision is intended to promote confidence in the judiciary.  *Liljeberg v. Health Serv.

Acquisition Corp*., 486 U.S. 847, 865 (1988).

As the Supreme Court has noted, § 455(a) "deals with the *objective appearance* of

partiality." *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994) (emphasis in *Liteky*).

Disqualification is required "only if it appears that [a judge] harbors an aversion, hostility or

disposition of a kind that a fair minded person could not set aside when judging the dispute."  *Id*.

at 558.  This objective standard includes not only actual impartiality, but also the appearance of

impartiality.  *See United States v. Carmichael*, 726 F.2d 158, 160 (4th Cir. 1984).  In other words,

"[d]isqualification is required if a reasonable factual basis exists for doubting the judge's

impartiality. . . .  The inquiry is whether a reasonable person would have a reasonable basis for

questioning the judge's impartiality, not whether the judge is in fact impartial." *In re Beard*, 811 F.2d 818, 827 (4th Cir. 1987) (internal citation omitted).

Notably, a "presiding judge is not . . . required to recuse [herself] simply because of 'unsupported, irrational or highly tenuous speculation.'" *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003) (quoting *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998)).  The decision is discretionary.  *Cherry*, 330 F.3d at 666.  "The alleged bias must derive from an extra-judicial source [and] . . . *result in an opinion on the merits on a basis other than that learned by the judge from his participation in the matter*." *Beard*, 811 F.2d at 827 (emphasis added).  Simply put, "[t]he proper test to be applied is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality." *Id*.

Section 455(b) of Title 28 of the United States Code enumerates circumstances in which a federal judge "shall" disqualify herself because partiality is presumed.  Under § 455(b)(1), a judge shall disqualify herself from a proceeding if she "has a personal bias or prejudice concerning a party . . . ."  As with § 455(a), the alleged bias or prejudice referenced in § 455(b)(1) must stem from an extrajudicial source.  *Belue v. Leventhal*, 640 F.3d 567, 572-73 (4th Cir. 2011).  But, § 455(b)(3) compels disqualification where the judge "has served in governmental employment *and in such capacity participated as counsel, adviser or material witness concerning the proceeding* or expressed an opinion concerning the merits of the particular case in controversy." (Emphasis mine.)

In my view, Smith has not presented a basis for recusal.  A defendant's mere dissatisfaction with a judge's rulings does not constitute a ground for recusal.

Much of the Recusal Motion is premised on this Court's effort to protect the defendant's right to appeal, because Smith claimed he wanted to pursue an appeal.  *See* ECF 933 at 1.  To that

4

end, the Court entered an amended judgment to extend the appeal deadline and then directed Smith's former counsel to take the mechanical step of filing the appeal. Curiously, Smith asserts that this effort indicates a "deep seated favoritism" on the part of the Court towards the government.  ECF 933 at 1.  Far from showing favoritism towards the government, the Court's actions were undertaken to assist Smith, so as to ensure that he did not forfeit the ability to appeal.

I discuss this sequence of events as to this matter in more detail, *infra*.  But, in essence, Smith's argument reflects an ongoing  misunderstanding of what transpired.  *See* ECF 880 (letter from the Court to Smith, explaining what occurred).  No reasonable person would question the Court's impartiality based on its effort to provide the defendant with what he requested.  *See In re Beard*, 811 F.2d at 827.  The contention does not warrant recusal.

The Recusal Motion also argues that recusal is warranted because I have "factual knowledge" as to various contentions in defendant's Petition, including his allegation of "collusion" between his counsel and the government, and his assertion as to the effects of his medication.  ECF 933 at 1.  Indeed, Smith has separately moved to compel my testimony at any evidentiary hearing regarding the Petition.  *See* ECF 930.

Again, this argument does not support recusal.  The fact that I have developed knowledge regarding this case from prior proceedings is not a basis for my recusal.  To the contrary, as mentioned, under the Rules Governing § 2255 Proceedings, it is "highly desirable" that the original judge consider a § 2255 petition because she is "familiar with the facts and circumstances surrounding the trial."  *Id*., Rule 4, Advisory Committee Note.

Accordingly, I shall deny the Recusal Motion.

## II. Factual and Procedural Background[3]

### 1. Events Prior to the Guilty Plea

Petitioner was indicted on January 11, 2018, along with seventeen others. ECF 1. A Superseding Indictment was filed on March 22, 2018 (ECF 157), adding another defendant. The Superseding Indictment charged Smith, the lead defendant, with multiple offenses: conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One); possession of firearms by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Eight); possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Nine); and possession of two firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count Ten).

Two of the charges in the Superseding Indictment carried a maximum penalty of life imprisonment. Specifically, both the § 846 charge (Count One) and the § 841 charge (Count Nine) involved one kilogram or more of a mixture or substance containing a detectable amount of heroin. *See* ECF 157 at 2, 10. Under 21 U.S.C. § 841(b)(1)(a)(i), such a drug quantity requires "a term of imprisonment which may not be less than 10 years or more than life."[4] Furthermore, the § 924(c) charge (Count Ten) carried a mandatory minimum sentence of five years of imprisonment, consecutive to any other sentence. 18 U.S.C. § 924(c)(1)(A)(i). Thus, as the government puts it: "Had Smith gone to trial [and had he been convicted], he faced a mandatory minimum of 15 years'

---

[3] Where appropriate, I have drawn on the facts set forth in my Memorandum Opinion of March 1, 2021 (ECF 911) and my Memorandum Opinion of December 23, 2021. ECF 1013.

[4] Under 21 U.S.C. § 846, "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

At the point Smith entered a plea, the government had not filed an enhancement notice under 21 U.S.C. § 851 for prior convictions.

imprisonment, and a maximum of life imprisonment, based on the combined sentences for the §
846 and § 924(c) offenses." ECF 1031 at 6.

Smith retained William B. Purpura, Jr. as his lawyer.  According to Smith, Christos G.
Vasiliades was also a member of Smith's legal team.  Smith refers to Mr. Vasiliades as his
"retained counsel," but explains that because Mr. Vasiliades was "not licensed to practice federal
law," he hired Mr. Purpura at Mr. Vasiliades's recommendation.  ECF 754-2, ¶ 1 (Aff. of Smith).

Although Mr. Purpura was hired to "formally represent" Smith and "present any
meritorious issues," Petitioner explains that Mr. Vasiliades continued to assist with pretrial
investigations and developing strategies.  *Id*. ¶ 3.  *See also* ECF 978 (Vasiliades Aff.), ¶¶ 1-7.
Notably, Mr. Vasiliades never entered an appearance in the case.  *See* Docket.  Nor did he ever
appear at any Court proceeding in this case.

Smith's arrest on April 5, 2018, was the result of an investigation by the federal Drug
Enforcement Administration ("DEA") and the Baltimore Police Department ("BPD") into two
separate heroin trafficking organizations in Baltimore City, one of which was known as the
"Transformers" heroin shop.  ECF 253 (the "Motion to Suppress") at 1; ECF 422 (the "Opposition
to Motion to Suppress") at 1-2.  As part of this investigation, the government obtained various
search warrants.

Of relevance here, on September 15, 2017, then Magistrate Judge Stephanie Gallagher[5]
approved a tracking warrant for a cell phone with the phone number of 202-847-9316 (the
"Tracking Warrant").  ECF 253 at 1-2; ECF 422 at 3; *see also* ECF 253-1 (Tracking Warrant and
application).  The Affidavit (the "Tracking Warrant Affidavit") in support of the warrant was
submitted by Task Force Officer ("TFO") Craig Jester of the BPD.  ECF 681 (Motion to Suppress

---

[5] Judge Gallagher is now a United States District Judge.

Tr.) at 33.   The warrant was sought after the arrest of Coconspirator 1, one of Petitioner's codefendants, whom investigators had identified as the leader of a drug trafficking organization using the "moniker" of "'Transformers.'"   ECF 253-1 at 6; ECF 253 at 1-2; ECF 422 at 2.

Investigators established surveillance at a hotel in Cockeysville, Maryland on September 12, 2017, where they believed Coconspirator 1 was located.   ECF 253-1 at 6; ECF 253 at 1; ECF 422 at 2.   After observing Coconspirator 1 exit Room 1123, investigators approached him, at which point he fled on foot while discarding a black bag over a nearby fence.   ECF 253-1 at 7; ECF 422 at 2.   After investigators apprehended Coconspirator 1, he was advised of his *Miranda* rights.   ECF 253-1 at 7.

Agents also recovered the bag that Coconspirator 1 had discarded, along with an electronic hotel room key.   *Id*.   The discarded bag contained 525 clear plastic "trashcans" filled with approximately 340 grams of suspected heroin.   *Id.*   Law enforcement obtained a search warrant for Coconspirator 1's hotel room.   A search of the room led to the recovery of $400,000 in U.S. currency; additional "trashcans" containing suspected heroin weighing approximately 250 grams; packaging and processing materials for heroin; and a Nutri Bullet blender containing suspected heroin weighing approximately 383 grams.   *Id*. at 7-8.

While investigators waited for authorization to search the hotel room, Coconspirator 1 consented to a search of his vehicle, which contained three cell phones.   *Id*. at 7; ECF 253 at 1. According to the defense, Coconspirator 1 also consented to a search of these phones.   ECF 253 at 1.   One of these cell phones, a black LG flip phone, had the telephone number of 443-684-0828 labelled on the back of the phone.   ECF 253-1 at 7.

Notably, Coconspirator 1's cell phone contained text messages with an unknown individual who was using the phone number of 202-847-9316 (the "Cell Phone" or "Phone Number").   *Id*. at

8; ECF 253 at 1-2; ECF 422 at 3.  Four text messages with that Phone Number were identified and are pertinent here, as follows.  *See* ECF 422 at 3; ECF 253-1 at 8.

| Sender | Date and Time | Message |
|---|---|---|
| Coconspirator 1 to 202-847-9316 | Sept. 4, 2017, 11:50 AM | Yo I need you when you can. |
| Coconspirator 1 to 202-847-9316 | Sept. 8, 2017, 10:51 AM | Yo I need you 36. |
| 202-847-9316 to Coconspirator 1 | Sept. 8, 2017, 10:53 AM | K can not tell you when. |
| Coconspirator 1 to 202-847-9316 | Sept. 8, 2017, 10:54 AM | Ard |

On or about September 15, 2017, the government applied for a warrant to track 202-847-9316.  ECF 422 at 3; ECF 253 at 2; ECF 253-1 at 4.  In the Affidavit of September 15, 2017 (ECF 681 at 33; ECF 253-1 at 5-13), filed in support of the warrant, TFO Jester recounted that he had been with the BPD since 2001, and for four years he had been assigned to a task force with the DEA investigating drug trafficking organizations.  ECF 681 at 35-36; ECF 253-1 at 5.  Jester averred that he had participated in numerous investigations regarding controlled dangerous substances ("CDS"), gangs, trafficking, and related topics, as well as the execution of numerous search warrants and arrest warrants for CDS traffickers.  ECF 253-1 at 5-6.  And, he stated that, through this training and experience, he had become familiar with the way that CDS traffickers communicate with one another.  *Id*. at 6; ECF 681 at 38.

TFO Jester indicated that the DEA and the BPD had been conducting an investigation of the Transformers drug trafficking organization and its leader, Coconspirator 1.  ECF 253-1 at 6.  Based on Jester's training and experience, Jester opined that Coconspirator 1 contacted the person using the Phone Number in order to purchase heroin for the Transformers drug shop.  *Id*. at 8.

In addition, Jester averred that investigators "met" with a "source of information" (the "SOI") "regarding the source of supply for [Coconspirator 1]."  *Id*.; ECF 681 at 39-40; ECF 253

at 3; ECF 422 at 3.  The SOI stated that the Cell Phone belonged to a male known to the SOI as "Pee," who was the "source of supply for heroin, for the Transformers heroin shop."  ECF 253-1 at 8; ECF 681 at 39-40; ECF 253 at 3; ECF 422 at 3.  The Affidavit provided no further information as to the SOI.

As noted, Judge Gallagher approved the Tracking Warrant on September 15, 2017.  ECF 253-1 at 2; ECF 422 at 3.   Using this warrant, investigators were able to monitor the movement of the Cell Phone in real time when it travelled from Maryland to New York City on September 17, 2017, returning the following morning.  ECF 253 at 2.  Investigators also tracked the Cell Phone on the afternoon of September 18, 2017, locating it at the Johns Hopkins Hospital Caroline Street parking garage on North Caroline Street in Baltimore.  *Id*. at 2-3.  Investigators responded to the garage and located a light green Honda Odyssey registered to Teresa Bellamy Moore at an address in Odenton, Maryland, which was also Smith's address.  *Id*. at 3.

On September 28, 2017, investigators obtained security footage of the Caroline Street garage for September 18, 2017.  *Id*.  It showed the Honda Odyssey in the garage at the same time as a vehicle operated by codefendant Will Robinson.  *Id*.

Based on this information, on September 20, 2017, under 18 U.S.C. § 2703(d), investigators applied for a pen register for the Phone Number.  *Id*.  On September 25, 2015, they sought an application for authorization to intercept communications as to the Phone Number.  *Id*.  Then, on October 11, 2017, they sought an application for authorization to use a cell-site simulator to identify the cellular device carried by Smith.  ECF 253 at 3.  The next day, October 12, 2017, they submitted an application for authorization to intercept communications as to a new phone number that was believed to belong to Smith.  *Id*.  And, on October 26, 2017, they applied for a

search warrant for the Honda Odyssey and the Odenton residence. *Id.* Smith also mentions an application on September 26, 2017, to place a GPS tracking device on his van. ECF 756-1 at 22.

In Smith's Affidavit that accompanies his Petition (ECF 754-2), Smith relates that he consulted with Mr. Purpura and Mr. Vasiliades regarding the Tracking Warrant. *Id.* ¶ 4. According to Smith, they "discovered" that Jester had lied in the Tracking Warrant Affidavit, because his statement that the SOI informed investigators that the Phone Number was that of a man known as "Pee" was "incredible." *Id.*; *see* ECF 253-1 at 8, ¶ 9. Thus, Smith and his legal team agreed to "file a motion to suppress the evidence," as well as a motion to challenge the Tracking Warrant as bare bones. ECF 754-2, ¶¶ 6, 7. Mr. Purpura allegedly explained to Smith that "the Franks hearing," *i.e.*, the challenge to the Tracking Warrant based upon Jester's purportedly false information, "was the stronger of the two issues." *Id.* ¶ 7.

Through counsel, Smith filed a "Motion to Suppress Tracking Warrant and all Derivative Evidence Obtained as a Result of the Warrant and Request for a *Franks* Hearing." ECF 253. The Motion to Suppress argued that the Tracking Warrant was not supported by probable cause, because the text message conversation "mean[t] nothing," and no information whatsoever was provided as to the SOI's basis for knowledge or credibility. *Id.* at 16-17. In addition, the Motion to Suppress contended that the Tracking Warrant was based on "false information," requiring its invalidation pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because it was "extremely unlikely" that the SOI could have identified the Phone Number as belonging to "Pee." *Id.* at 17-18.[6] The government opposed the Motion to Suppress. ECF 422. Smith replied. ECF 443.

---

[6] The Motion to Suppress made additional arguments about three of the authorizations, which are not relevant here. *See* ECF 253 at 20-21.

In response to correspondence from counsel (ECF 516, ECF 517), the Court held a telephone status conference with counsel on April 15, 2019. *See* Docket. Thereafter, the Court confirmed: "The parties agree that the sole issue for the Court's consideration at the motion hearing . . . pertains to the sufficiency of the affidavit on which Magistrate Judge Gallagher relied in issuing a tracking warrant on September 15, 2017, for [the Cell Phone]. The defense is no longer seeking a *Franks* hearing." ECF 523 (Amended Order of Apr. 16, 2019).

The hearing on the Motion to Suppress was scheduled for May 17, 2019. *See* ECF 536; ECF 556; *see also* ECF 262; ECF 351; ECF 451. Smith avers that he met with Mr. Purpura and Mr. Vasiliades "[d]uring a visit before the hearing," although the Affidavit does not specify the date. ECF 754-2, ¶ 11. According to Smith, at this meeting his legal team informed him that the government, via Assistant U.S. Attorneys James Wallner, Christine Goo, and Brandon Moore, "came clean" and admitted that the SOI in the Tracking Warrant was Coconspirator 1. ECF 754-2, ¶ 11. Mr. Purpura and Mr. Vasiliades "gave no indication" that this disclosure made their case weaker, and agreed with Smith's suggestion that this disclosure actually made their case stronger, because Coconspirator 1's identity was "hid" from Judge Gallagher. *Id.*

In his Affidavit (ECF 978-1), Mr. Vasiliades avers that Mr. Purpura contacted him prior to the Motion to Suppress hearing, and disclosed that the government had informed him that Coconspirator 1 was the SOI. *Id.* ¶ 11. Mr. Vasiliades affirms that he and Mr. Purpura then visited Smith to inform him. *Id.* ¶ 12. In its briefing, the government does not concede that Coconspirator 1 was the SOI, although it does not offer a competing version of events.

The night before the motion hearing, *i.e.*, May 16, 2019, Mr. Purpura again visited Smith. ECF 754-2, ¶ 12. Smith claims that Mr. Purpura asked him if he would be willing to "drop" his motion in exchange for a plea deal for seven years' imprisonment. *Id.* Smith avers that he was

"confused" by this inquiry, given what he viewed as the strength of his case, and asked Mr. Purpura if he would "want to have the motion" if it were not "for the amount of time [Smith] was facing." *Id*.  When Mr. Purpura said "yes," Smith replied, "lets [sic] rumble."  *Id*.  Smith asserts that, based on this conversation, he expected Mr. Purpura to argue the *Franks* issue at the hearing the next day.  *Id*. ¶ 13.  However, as noted, by mid April 2019, defense counsel had informed the Court that the defense no longer intended to seek a *Franks* hearing.  *See* ECF 523.

As noted, the motion hearing was held on May 17, 2019.  ECF 556.  At the outset, Mr. Purpura confirmed that the defense had withdrawn the request for a *Franks* hearing.  ECF 681 at 3.  Thereafter, the Court heard oral argument as to whether the Tracking Warrant Affidavit was sufficient to support probable cause.  Without indicating the identity of the SOI, the government contended that the Court should consider the SOI "as one would if it was an anonymous source," meaning it could be corroborated by the other information in the Affidavit.  *Id*. at 13-14.  Mr. Purpura referred to the portion of the Affidavit that mentioned the SOI as "purely conclusory statements without any indication of reliability."  *Id*. at 26.

During argument, the Court remarked that there was little in the Tracking Warrant Affidavit that would provide the reviewing magistrate "with any basis to credit" what the SOI said. *Id*. at 17.  The Court noted that in Jester's application for the cell-site simulator warrant about a month later, on October 11, 2017, Jester described the SOI as having only recently come to the attention of law enforcement; as a previous cooperating witness "not presently registered;" and as an individual whose information had proven reliable in the past, and whose most recent information had been verified as reliable to the extent possible.  *Id*. at 16.  The Court pointed to the information as an example of a more "fulsome" description to enable the magistrate to credit the SOI.  *Id.*

At the conclusion of argument, the Court ruled from the bench.  *Id*. at 32-47; *see also* ECF 557 (Order of May 17, 2019).  In particular, the Court recounted the contents of the Affidavit and summarized the applicable case law.  And, I found that the Tracking Warrant was supported by probable cause.  ECF 681 at 40.  But, even if it was not, I concluded that the good faith exception was applicable under *United States v. Leon*, 468 U.S. 897 (1984), and its progeny.  ECF 681 at 40.

In determining that the Tracking Warrant was supported by probable cause, I expressly declined to consider information in the Affidavit relating to the SOI, because the Affidavit lacked information to corroborate the SOI's reliability.  *Id*. at 43 ("I'm not even considering [the SOI] in my analysis because I don't think that's helpful."); *see also id*. at 39-40.  Instead, I found that, considering the text message conversation in the context of Coconspirator 1's apprehension, recounted in the Affidavit, as well as the items recovered from him, the remaining information in the Affidavit was sufficient to support probable cause.  *Id*. at 43-44.

Smith avers that, when he realized that Mr. Purpura was not going to present a *Franks* argument at the hearing, he was "shocked" and "tried to address the court [himself] and inform he [sic] about the lies in the affidavit and that [Coconspirator 1] was the informant."  ECF 742-2, ¶ 13.  Indeed, the motion hearing concluded with the following exchange, ECF 681 at 47-49:

THE DEFENDANT: You ain't a --

MS. GOO: Your Honor --

THE COURT: I'm sorry. I missed what you said, sir.

THE DEFENDANT: I said --

MR. PURPURA: No, no. Please. I'm sorry.

THE COURT: But I didn't hear it.

MR. PURPURA: I don't think it was meant to be heard, Your Honor.

THE DEFENDANT: Yes, it was.

MR. PURPURA: Talk to me.

THE DEFENDANT: Yes, it was.

MR. PURPURA: Talk to me.

THE COURT: Yes, I'd like to hear it.

(Pause in proceedings while Mr. Purpura and the defendant confer.)

MR. PURPURA: Thank you, Judge. It's nice to see you.

THE COURT: Yes. And, of course, that's what appellate courts are made for.

MR. PURPURA: Very good.

THE COURT: I may learn I was wrong.

THE DEFENDANT: Well, which is not making up a very meaningful --

MR. PURPURA: Judge, I apologize.

THE DEFENDANT: I'm --

MR. PURPURA: No. No. I tell you --

THE DEFENDANT: I'm going to explain it.

MR. PURPURA: Well, then, I'm going to leave as your counsel. Do you fire me right now?

THE DEFENDANT: I didn't fire you. I did not fire you. Of course, you won't say it, I'm going to say it for the record. Okay. What you overlooked was this, ma'am. You overlooked that the affiant who written [sic] the affidavit, right? The corrupt allegations is [sic] before. The man lied in the affidavit. He lied about the SOI. He lied about all this stuff.

THE COURT: Well, I didn't consider the SOI, for one thing. And there's no evidence before me in this -- there's no claim here of any lie.

MR. PURPURA: And the bottom line, as I explained -- look, Mr. Smith --

THE DEFENDANT: You know the affidavits [sic] lacking for probable cause. It's clear. The affidavits [sic] lacking.

THE COURT: Well, the government can show whether those text messages exist. That will show whether that's a lie.

MR. PURPURA: The text message --

THE COURT: And the government can show – I'm sorry, Mr. Purpura -- whether $400,000 was recovered from [Coconspirator 1] and whether a kilo was recovered from [Coconspirator 1]. Is that a lie?

THE DEFENDANT: What that have to do with me? What that have to do with me, ma'am?

THE COURT: Okay. I'll spare you, Mr. Purpura, and I'll call for a recess.

(Conclusion of Proceedings at 3:28 p.m.)

Smith avers that, after the hearing, Mr. Purpura informed him that he could obtain a plea deal for ten years of imprisonment, but that he had to take the deal in three days.  ECF 742-2, ¶ 14.  He claims that he was "not given enough time to really think things through," and states that he was confused as to why Mr. Purpura did not pursue the *Franks* hearing, and as to why he only had three days to consider the plea offer, "or the government was going to career [him] out and [he] would be facing life in prison."  *Id*.  Smith maintains that he felt that he had no choice but to take the ten-year deal, and would have taken the seven-year deal if he had known that Mr. Purpura was going to waive his *Franks* hearing.  *Id*. ¶ 15.

### 2.   Guilty Plea and Sentencing

A few days after the motion hearing, on May 23, 2019,  Smith entered a plea of guilty (ECF 562) to Count One of the Superseding Indictment, pursuant to a Plea Agreement.  ECF 563 (the "Plea Agreement").  Count One carries a mandatory minimum term of imprisonment of ten years, with a maximum term of life imprisonment.  *Id.* ¶ 3.  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 120 months' imprisonment.  *Id.* ¶ 9. In addition, Counts Eight, Nine, and Ten would be dismissed.  *Id.* ¶ 10; *see* ECF 645.

The Plea Agreement included a stipulation of facts.  ECF 563 at 10-11.  The stipulation reflects that from March 2017 to January 2018, defendant conspired with others "to obtain wholesale quantities of heroin and distribute one kilogram or more of that heroin at the street-level." *Id.* at 10.  Smith "supplied two different heroin shops," each of which was led by a coconspirator, whom the stipulation refers to as "Co-Conspirator 1" and "Co-Conspirator 2."  *Id.* Through a wiretap investigation and the use of pole cameras, law enforcement gathered evidence of "the large scale heroin distribution that occurred in both shops."  *Id.*

Coconspirator 1 was arrested on September 12, 2017.  *Id.*  After searching one of the phones in his possession, law enforcement learned that Coconspirator 1 was in contact with an individual who went by the name of "Pee." After further investigation, law enforcement identified the Petitioner as Pee and discovered that he was Coconspirator 1's "source of supply."  *Id.*

Investigators then began tracking Smith's Cell Phone.  *Id.*  On the basis of the Cell Phone tracking information, investigators determined that on September 18, 2017, Smith met with Coconspirator 2 in a parking garage.  *Id.*  And, law enforcement intercepted conversations of the Petitioner on the Cell Phone.  *Id.* at 11.

On October 26, 2017, law enforcement executed a search warrant at Smith's residence.  *Id.* at 10.  Two firearms were found: a "semi-automatic .9mm Luger pistol," loaded with fourteen rounds of ammunition, and a "semi-automatic .40 caliber pistol," loaded with eleven rounds of ammunition.  *Id.*  In addition, investigators recovered 2,800 grams of heroin, hidden in a compartment within a coffee table.  *Id.*

The stipulation also reflects that Smith "agree[d] that it was reasonably foreseeable to him that members of the conspiracy would distribute one kilogram or more of heroin," and that "he possessed firearms in furtherance of his drug trafficking."  *Id.* at 11.

In the Plea Agreement, the parties contemplated a base offense level of 30, pursuant to § 2D1.1(c)(5) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ¶ 6(a). The parties also agreed that the offense level was subject to a two-level enhancement in accordance with U.S.S.G. § 2D1.1(b)(1), because Smith possessed a firearm during the commission of the instant offense. *Id.* And, the Plea Agreement contemplated three deductions under U.S.S.G. § 3E1.1, based on Smith's acceptance of responsibility for his conduct. *Id.* ¶ 6(b).

The Plea Agreement did not include any agreement as to Petitioner's criminal history. *Id.* ¶ 7. Nevertheless, the parties agreed that a sentence of 120 months of incarceration was the appropriate disposition of the case. *Id.* ¶ 9.

The Plea Agreement provided that it constituted "the complete plea agreement" in the case; that it superseded any prior agreements, promises, or conditions between the U.S. Attorney's Office and Smith; and that there were no other agreements, promises, or understandings between the U.S. Attorney's Office and Smith other than those in the Plea Agreement. *Id.* ¶ 15. Smith signed the Plea Agreement, indicating that he had carefully reviewed it, understood it, and agreed to it, and that he was "completely satisfied" with the representation of his attorney. *Id.* at 9.

The plea hearing was held on May 23, 2019, pursuant to Fed. R. Crim. P. 11. ECF 562. It began at 10:37 a.m. ECF 682 (Tr.) at 2. Petitioner was sworn, and indicated that he understood he was obligated to answer the questions truthfully. *Id.* at 2, 4. Early in the hearing, the following colloquy took place regarding Smith's medications and competence (*id.* at 4-6):

Q Have you been treated recently for any mental health and/or substance abuse problem?

A No.

Q In the last 48 hours, have you had any kind of medication?

A Yes.

Q And I ask this question not to pry, sir, but I need to be sure whatever medicines you take, or medicine, doesn't alter your mental status. So what medication and for what problem?

A For diabetes, high blood pressure, high cholesterol, kidney failure, spine injury, pain medicine.

Q What's the last one?

A Pain medicine.

Q Pain medicine. Okay. You can pull that microphone closer to you. And do you know the names of these medicines?

A Some of them, very few of them.

Q Well, the ones you do know, what are they called?

A Well, I take insulin, I take Metformin, I take --

Q So you mentioned high blood pressure.

A -- Lisinopril, Adderall pain, Galapistons (phonetic). They've given me aspirins. They've given me – it's a couple I don't recall. I don't want to give you the wrong name.

Q Okay. I think you mentioned Gabapentin and I think you mentioned something else for pain?

A Something they give me.

Q Okay. And how frequently do you take these medicines?

A Daily.

Q And at what time of day do you take the pain medicines?

A I took one this morning. I take another one this evening.

Q Okay. Now, is there anything about these medications, including the pain medicines, but any of them, that somehow affect your ability to know what you're doing here today?

A Not to my knowledge.

Q And, counsel, are you satisfied your client is capable of proceeding?

MR. PURPURA: Your Honor, I can tell the Court that I've met with Mr. Smith 20-plus times. He is bright, alert, goes over all the information that I give to him. He processes everything. I've never found any time at all when he didn't understand what I was talking about. If he didn't understand, he would ask me and we would go through it. So I'm quite confident that he's competent today.

Q Okay. Well, he appears alert and oriented to me today. And last Friday when he was before the Court, if he was on these medicines, he was also quite alert, understood the Court's ruling, didn't like it, indicated so. So I know he understood. And he's smiling now, so he gets what I'm saying as well. So I am satisfied, also, that we can proceed.

The Plea Agreement provided for three deductions to the offense level under U.S.S.G. § 3E1.1, for acceptance of responsibility. As to the one-point deduction under U.S.S.G. § 3E1.1(b), the Court noted that the government is often unwilling to make such a concession when a defendant has litigated a motion, as Smith had done. ECF 682 at 21.

Notably, throughout the hearing, Smith asked a number of questions as to the details and implications of the Plea Agreement. *See id*. at 7-12, 16, 19, 23, 26-29, 44-45. For example, he asked me to clarify my explanation as to the consequences of a violation of a condition of supervised release. *Id*. at 16. And, he asked what would happen if the government proved that he breached a promise he had made in the Plea Agreement. *Id*. at 26-29. This conduct reflects that Smith was alert, closely followed the proceedings and the substance of the discussion, and was willing to speak up.

In addition, the Court asked Smith if there was anything he wanted Mr. Purpura to do that Mr. Purpura had "failed to do." *Id*. at 8. Smith mentioned one issue, related to obtaining certain raw data records from T-Mobile, that is not relevant to any issue raised in the Petition. *Id*. at 8-11. The Court asked if, aside from this issue, there was anything else that Smith wanted Mr. Purpura to do that he had failed to do, and Smith said no. *Id*. at 9. And, upon being asked if he had "any

complaints whatsoever about Mr. Purpura's representation," Smith said no, and agreed that he was "fully satisfied" with the services provided by Mr. Purpura.  *Id*. at 11.

The Court then thoroughly reviewed the Plea Agreement with Smith, as well as the rights he has as a criminal defendant and the rights has agreed to waive by pleading guilty.  *Id*. at 12-40. Smith confirmed that he understood the contents of the Plea Agreement and the rights he was waiving.  He acknowledged that, by pleading guilty, he was waiving "all rights to appeal [his] sentence."  *Id*. at 24.  Moreover, the Court advised Smith that, by pleading guilty, he was giving up his right to challenge the Court's ruling at the motion hearing on May 17, 2019.  *Id*. at 38-39, 43-44.  Smith indicated that he understood.  *Id*. at 38-39, 44.

Smith also confirmed that he understood that the Plea Agreement document was the "entire plea agreement."  *Id*. at 30.  He acknowledged that, apart from the Plea Agreement, no one had made any promises to him to induce him to plead guilty; no one had coerced him; he was pleading guilty of his own free will and because he was guilty; and that the stipulation of facts was an accurate summary of the facts that the government would prove if the case went to trial.  *Id*. at 39, 41, 45.

During the hearing, the Court observed that Smith had become somewhat agitated. Therefore, I inquired whether he wanted a break.  *Id.* at 33.  The following transpired, *id*. at 33-35:

> Q Would you like a break, sir?
>
> THE DEFENDANT: Please.
>
> THE COURT: Okay. Why don't we take a short recess. And as soon as Mr. Smith's ready, everybody let me know, and we'll resume.

(Recess at 11:22 a.m. Resume at 11:27 a.m.)[7]

THE COURT: All right. Mr. Smith, have you had enough time?

THE DEFENDANT: I'm good. I'm good.

THE COURT: Okay.

MR. PURPURA: You can sit.

THE COURT: Okay. Please be seated.

MR. PURPURA: Judge, thank you. I think the record should reflect the Court gave us about 10 to 15 minutes. We could have had more time. I suggested to Mr. Smith if he wanted to go back to the lockup, we could talk further. He's indicated no, he's ready to go forward. As the Court noted, he had an emotional reaction to this portion of the Court's colloquy, which was his advisement of the rights that he's waiving. And I can tell the Court in the past year that, knowing Mr. Smith, he takes these constitutional rights probably more serious than any other defendant. I think that in itself is admirable. Whether it's guilty or not guilty, he understands what constitutional rights he has and what he's waiving.

EXAMINATION OF THE DEFENDANT BY THE COURT:

Q Okay. And I appreciate that. And I think everyone in this courtroom feels the same way about the significance of these rights. Even however many times I've conducted a guilty plea proceeding, they're as meaningful today as the first time I ever did it. So I appreciate your sensitivity to it, Mr. Smith. But if there were ever any doubt in your mind about how you want to proceed, you've got to speak up. You still wish to go forward, sir?

A I do.

Q Any doubt in your mind?

A I'm good.

Q Pardon?

A I'm good.

Q You're good. Okay.

---

[7] The transcript reflects a five-minute recess. Mr. Purpura later referred to a ten- to fifteen-minute recess. I believe that the recess was at least ten minutes.  Indeed, it generally takes several minutes for me just to leave the bench, proceed to my Chambers, and return to the bench.

In his Affidavit, Smith avers that during the colloquy, he "began to feel like [he] was high, [he] could not think straight and [he] was under a lot of pressure," and started having a "break-down."  ECF 754-2, ¶ 16.  He attributes this to his Neurontin medication, which can "change[]" his "mental state."  *Id.*  He asserts that although he was "trembling, crying, and having extreme anxiety," Mr. Purpura never said anything or asked to pause proceedings, until eventually the Court noticed.  *Id.* ¶ 17.  During the recess, he states that he informed Mr. Purpura that he "felt high, and like [he] was hallucinating, none of this felt real to [him]."  *Id.* ¶ 18.  Mr. Purpura's response was to say that he needed to "hurry up and take the deal before the government changes their mind and [Smith] end[s] up with a life sentence."  *Id.*  He labels Mr. Purpura's explanation for his agitation to the Court—that he had an emotional reaction to waiving his rights—as not credible given Petitioner's extensive prior experience with the criminal justice system.  *Id.* ¶ 19.  And, he avers that this "reaction did not leave until later in the afternoon."  *Id.* ¶ 20.

At the conclusion of the plea hearing, the Court again confirmed that Smith wished to plead guilty, ECF 682 at 45:

THE COURT: Okay. Do you still wish to plead guilty, sir?

THE DEFENDANT: Yes.

THE COURT: Are you pleading guilty freely and voluntarily?

THE DEFENDANT: I am.

THE COURT: Are you pleading guilty because you are guilty as charged?

THE DEFENDANT: I am.

THE COURT: And I'm going to ask you one more time. Do you still wish to plead guilty?

THE DEFENDANT: I do.

Accordingly, I found that Smith was "fully competent, alert, oriented, and capable of entering an informed plea of guilty, that he is well aware of and understands the nature of the charges and the relevant consequences of his plea of guilty, and that his plea of guilty, on the advice of competent counsel with whose services he is satisfied, is a knowing, intelligent, and voluntary plea supported by an independent basis in fact sustaining each of the essential elements of the offense." *Id*. at 45-46.

Sentencing was held on August 21, 2019. ECF 643. Smith, who was born in 1963, was fifty-six years of age at the time. ECF 647 (Amended Presentence Report, "PSR") at 3. With respect to Petitioner's health, the PSR reflected that Smith has Diabetes Mellitus, kidney disease, and hypertension, among other conditions. *Id.* ¶ 62. Moreover, the PSR advised that Smith had struggled with substance abuse since his adolescence. *See id.* ¶¶ 67-72. However, Smith has never received substance abuse treatment. *Id.* ¶ 72.

According to the PSR, Smith previously served extensive sentences in the State system. *See id*. ¶¶ 29-36. During a two-month period in December 1981 and January 1982, at the age of 18, Smith committed multiple daytime housebreaking offenses. *See id.* ¶¶ 29-34. And, Petitioner committed a storehouse breaking offense. *Id.* ¶ 34. He received significant sentences, totaling about 30 years. *See id.* ¶¶ 29-34. Smith escaped from prison for four days in 1992. *See id.* ¶ 34. In 1996, he was paroled. *Id.* He was returned to incarceration in March 1997 for a violation of parole, but parole was continued shortly thereafter. *Id.*

In 1998, Smith pled guilty to maintaining a dwelling for keeping controlled substances and possession of a firearm during the commission of a felony. *Id*. ¶ 36. He was sentenced to two years of incarceration on the first count, with the sentence suspended after the first year. *Id*. And,

he was sentenced to eight years of incarceration on the second count, with the sentence suspended after three years. *Id.*

In 2002, Smith was found guilty, after a trial, of felonious possession of cocaine; felonious possession of heroin; a misdemeanor paraphernalia charge; possession of cocaine; possession of heroin; and possession of marijuana. *Id.* ¶ 35. These convictions constituted a violation of parole. *See id.* ¶ 34. The trial stemmed from his arrest for these offenses in 1997, but he was "FTA." *Id.* He was sentenced to a total of twenty-one years' incarceration, with credit for 297 days of time served. *Id.* ¶ 35. And, at a hearing on a motion for new trial, Petitioner was found in contempt of court on three occasions. *Id.* He was paroled in February 2012. *Id.* And, his sentence was terminated in February 2018. *Id.*[8]

The PSR reflected a final offense level of 29, *id.* ¶ 24, and a subtotal criminal history score of six points. *Id.* ¶ 37. However, because the instant offense was committed while Smith was on parole, two points were added. *Id.* ¶ 38. Thus, Petitioner's criminal history score was eight, which established a criminal history category of IV. *Id.* ¶ 39. Smith's advisory sentencing Guidelines called for a sentence ranging from 121 months to 151 months of incarceration. *Id.* ¶ 85. And, as noted, Smith's offense of conviction subjected him to a mandatory minimum sentence of 10 years of imprisonment. *Id.* ¶ 84; *see* 21 U.S.C. § 841(b)(1)(A).

At sentencing on August 21, 2019 (ECF 643), the Court imposed the agreed upon sentence of 120 months of incarceration, pursuant to Fed. R. Crim. P. 11(c)(1)(C), with credit for time served since Petitioner's arrest on April 5, 2018. *See* ECF 645. As indicated, the sentence corresponded to the congressionally mandated minimum sentence, and was one month below the lowest end of the Guidelines range.

---

[8] Defendant's parole was originally scheduled to expire in September 2023. *Id.* ¶ 35.

At the sentencing hearing, I noted that, although the Court would adopt the C plea, it appeared to be an "extremely lenient" sentence and, in light of the defendant's role and the sentences meted out to certain codefendants, even a "gift" to Smith.  ECF 684 (Sentencing Tr.) at 24; *see also id*. at 28.  I commented: "I know defense counsel is very capable.  I don't know how much Mr. Smith realizes what he was exposed to and what the government could have insisted on unless he chose to go to trial, and if he did and were convicted what that would mean."  *Id*. at 23. I also reiterated that it was "not uncommon" for the government to decline to grant a one-point deduction for timely notification of intent to plead guilty when there is a motion hearing, as there had been here.  *Id*. at 5-6.

The prosecutor observed that "Mr. Purpura's obviously a very, very good advocate for his client and has worked had for Mr. Smith."  *Id*. at 24.  On the other hand, the prosecutor recognized that "there were some late litigation risks."  *Id*.

Smith did not file a direct appeal, at least until the circumstances described *infra*, relating to his Petition.  BOP records reflect that Smith is currently serving his sentence at FCI Cumberland. ECF 996 at 1; *see Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Apr. 4, 2022).[9]

### 3.  Petition Procedural History

Petitioner's submissions are approximately 200 pages, nearly all typed and single-spaced, exclusive of exhibits.  It is not always easy to discern Smith's specific arguments, particularly as they sometimes appear to shift in the course of the briefing.

---

[9] At the time of filing the Petition, Smith was incarcerated at FCC Petersburg. ECF 756 at 1. He was then transferred to FCC Yazoo City. *See, e.g.*, FCC 847 at 39. He was transferred to FCI Cumberland on September 27, 2021. ECF 1002-1 at 2; *see* ECF 992.

Smith initiated his post-conviction proceeding in September 2020. *See* ECF 754; ECF 756.[10] As originally filed, the Petition was supported by a memorandum (ECF 756-1) and an Affidavit from Smith. ECF 754-2. Notably, in that Petition Smith alleged that Mr. Purpura was ineffective for failing to file a notice of direct appeal after having been instructed to do so by Smith. ECF 756-1 at 29.

The government responded. ECF 809. It supported granting the Petition in part, so as to permit Smith to file a belated appeal. *Id.* at 14-15.

Thereafter, I entered an Order granting the Petition as to the appeal, while denying the remainder of the Petition, without prejudice. ECF 819 (Order of November 23, 2020). And, on the same day, I issued an Amended Judgment. *See* ECF 821 (Amended Judgment). By filing the Amended Judgment, the appeal clock was restarted. And, as a courtesy to Smith, and to assure that the desired appeal was timely filed, I directed Mr. Purpura to file the appeal, so as to preserve Smith's appellate rights. Mr. Purpura complied. *See* ECF 830 (notice of appeal); ECF 880.

The act of timely filing an appeal is essentially a mechanical step, but a necessary one. Of import, in the notice of appeal, Mr. Purpura indicated that new counsel would have to be appointed for Smith under the Criminal Justice Act, due to a conflict. *See id.*

Despite Smith's claim in his Petition that he had wanted to appeal, and had previously directed his lawyer to note an appeal, he asked the appellate court to dismiss the appeal that was filed for him; the Fourth Circuit granted Smith's request. *See* ECF 870. In submissions to this

---

[10] ECF 754 is a "Motion for Extension to Complete 2255 Motion," which includes the memorandum in support of the Petition subsequently docketed at ECF 756-1 (*see* ECF 754-1), as well as an Affidavit in support of the Petition. *See* ECF 754-2. In ECF 754, Smith sought a four-month extension to complete his Petition. I granted Smith until January 11, 2021, to supplement the Petition. ECF 755.

Court, Smith asked to "waive" his notice of appeal, stating that Mr. Purpura was no longer his attorney and he did not have the authority to file an appeal on defendant's behalf.  Smith also claimed that he wanted to proceed via his § 2255 petition, rather than by way of an appeal.  ECF 876; ECF 878.

In a letter to Smith (ECF 880), I denied ECF 876 and ECF 878 as moot, given the Fourth Circuit's dismissal of the appeal.  ECF 880 at 1.  I also attempted to explain what had occurred relative to the appeal, including that Mr. Purpura had filed the appeal at my direction merely to preserve Smith's appellate rights, but took no further action.  *Id.*  I also stated that, based on Smith's decision not to pursue a direct appeal, I would reopen his § 2255 motion.  *Id.*  But, I noted that "on the basis of what has occurred, there is no merit to" Smith's contention that counsel failed to file an appeal.  *Id.*

Meanwhile, Smith replied to the Opposition.  ECF 843.  And, in December 2020, he filed a supplemental § 2255 petition, which repeated the arguments in his original Petition, but omitted the argument relating to failure to file an appeal.  ECF 847.  And, he filed a seemingly identical document at ECF 891.  In addition, in February 2021 Smith sought to amend the Petition, to "include the October 11, 2017 sworn search warrant application."  ECF 919 ("Amendment One").

The government responded in opposition to ECF 847 and ECF 891.  ECF 921.  In this First Supplemental Opposition, it also opposed Amendment One.  *Id.*  The First Supplemental Opposition is accompanied by a sealed exhibit.  ECF 923.  And, Smith replied to the First Supplemental Opposition.  ECF 938; *see also* ECF 939 (an identical filing).

From September through December 2021, Smith submitted five more motions to amend the Petition.  *See* ECF 978 ("Amendment Two"); ECF 1003 ("Amendment Three"); ECF 1008 ("Amendment Four"); ECF 1020 ("Amendment Five"); ECF 1022 ("Amendment Six").  Several

are accompanied by exhibits.  With the exception of Amendment Two, which merely sought to add the Affidavit from Mr. Vasiliades to the Petition (*see* ECF 978-1), all of the amendments contain additional substantive arguments.  The government has responded in opposition to each amendment, except for Amendment Two.  ECF 1031.  Smith has replied (ECF 1040) to the Second Supplemental Opposition, supported by five exhibits.  ECF 1040-2 to ECF 1040-12.[11]

In addition, as noted, Smith has filed a variety of other motions.  *See* ECF 930; ECF 931; ECF 932; ECF 933.

### III. Standard of Review

#### A.

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'"  *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Under § 2255, the Petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid.  *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).  And, "an error of law does not provide a basis for collateral attack unless the claimed error

---

[11] One of Smith's exhibits spans seven ECF entries, presumably because of its size. *See* ECF 1040-3 to ECF 1040-9.

constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting Hill, 368 U.S. at 428).

The scope of collateral attack under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, 578 U.S. 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)).   A failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains" or "actual innocence." *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); Reed v. Farley, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.' "); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 509 (2003). Ordinarily, such claims are not litigated on direct appeal.   Claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *see also United States v. Ladson*, 793 Fed. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam).   Generally, such claims are

litigated in a § 2255 action, to allow for development of the record.  *Massaro*, 538 U.S. at 504-06; *Ladson*, 793 Fed. App'x at 203.

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief. . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004).  Generally, a district court has discretion as to whether to hold a hearing, but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim[.]"  *Mayhew*, 995 F.3d at 176-77.  If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor."  *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021) (same).

In my view, no hearing is warranted here.

## B.

For the most part, Smith asserts claims of ineffective assistance of trial counsel.  The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, ____ U.S. ____, 137 S. Ct. 759, 775 (2017).  Ineffective assistance of counsel is a well recognized basis for relief under § 2255. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States*

31

*v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *Akande*, 956 F.3d at 260; *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).  First, the petitioner must show that counsel's performance was deficient.  Second, the petitioner must show that he was prejudiced by the deficient performance.  *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). The petitioner must prove his claim by a preponderance of the evidence.  *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010); *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

The first *Strickland* prong, also known as the "performance prong," relates to professional competence.  The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar."  *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149.  In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task."  Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally

competent assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). And, "the *Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, because "the standard of judging counsel's representation is a most deferential one." *Id.* Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Notably, a claim of ineffective assistance is evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation." *Palacios*, 982 F.3d at 924; *see Carthorne*, 878 F.3d at 466. Thus, "[t]o avoid the distorting effects of hindsight, claims under *Strickland's* performance prong are 'evaluated in light of the available authority'" at the relevant time. *United States v. Morris*, 917 F.3d 818, 823 (4th Cir 2019) (citation omitted). To be sure, counsel "are obliged to make [] argument[s] that [are] sufficiently foreshadowed in existing case law," but counsel is not deficient "for failing to predict" changes in the law. *Id.* at 824 (alterations in *Morris*; internal quotation marks omitted).

Under the second *Strickland* prong, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice

prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## C.

Smith entered a plea of guilty pursuant to a plea agreement. *See* ECF 562; ECF 563. A guilty plea is a "waiver of [a defendant's] right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). It is "a grave and solemn act . . . ." *Id.* And, a plea agreement "is an essential aspect of the administration of criminal justice . . . ." *United States v. Lewis*, 633 F.3d 262, 269 (4th Cir. 2011).

The plea process is governed by Fed. R. Crim. P. 11. For a guilty plea to be valid, it must be voluntary. *Id.* And, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely

consequences." *Id.*; *see Bradshall v. Stumpf*, 545 U.S. 175, 183 (2005) (same).  Thus, the plea must reflect an "intelligent choice among the alternative courses of action open to the defendant."  *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

A plea cannot be "voluntary in the sense that it constituted an intelligent admission . . . unless respondent received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Henderson v. Morgan*, 426 U.S. 637, 645 (1976) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)).  However, the Supreme Court clarified in *Marshall v. Lonberger*, 459 U.S. 422, 436 (1983), that "it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Marshall*, 459 U.S. at 436 (1983) (quoting *Henderson*, 426 U.S. at 647) (internal quotations omitted).

Of relevance here, the Sixth Amendment right to counsel extends to the plea bargaining process. *McMann v. Richardson,* 397 U.S. 749, 771 (1970); *United States v. Murillo*, 927 F.3d 808, 815 (4th Cir. 2019); *see also Frye*, 566 U.S. at 140-44; *Lafler*, 566 U.S. at 162.  In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court explained that, "where . . . a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness [and intelligence] of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'"  *Id.* at 56 (citing *McMann*, 397 U.S. at 771).  And, in assessing whether counsel's performance was deficient, courts adopt a "strong presumption" that counsel's actions fell within the "wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.

In the context of a plea bargain, "the defendant is the master of the outcome."  *Murillo*, 927 F.3d at 815.  And, "[t]he prejudice analysis in the context of the plea-bargaining process requires

a fact-based evaluation of the weight of the evidence." *Id.* To this end, "plea agreement language and sworn statements must be considered in their context[.]" *Id.* at 817; *see United States v. Lemaster*, 403 F.3d 216, 217 (4th Cir. 2005).

When a defendant claims ineffective assistance of counsel after pleading guilty, he is "bound," absent clear and convincing evidence to the contrary, "by the representations he made under oath during a plea colloquy." *Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1299 (4th Cir. 1992); *see Blackledge v. Allison*, 431 U.S. 63, 74-75 (1977); *Lemaster*, 403 F.3d at 221-22 ("[A] district court should . . . dismiss any 2255 motion that necessarily relied on allegations that contradict the sworn statements."). Indeed, "a defendant's solemn declarations in open court affirming a [plea] agreement . . . 'carry a strong presumption of verity.'" *Lemaster*, 403 F.3d at 221 (quoting *Blackledge*, 431 U.S. at 74). Therefore, conclusory allegations in a § 2255 petition that are contrary to testimony provided at a Rule 11 hearing are "palpably incredible and patently frivolous or false." *Lemaster*, 403 F.3d at 222.

And, the prejudice prong of the Strickland test is slightly modified in the context of plea bargaining. *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988). In *Hooper*, the Fourth Circuit explained, *id.* (quoting *Hill*, 474 U.S. at 59): "When a defendant challenges a conviction entered after a guilty plea, [the] 'prejudice' prong of the [*Strickland*] test is slightly modified. Such a defendant 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Accord United States v. Lewis*, 477 F. App'x 79, 81 (4th Cir. 2012); *Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000); *see also Richardson*, 820 F. App'x at 226.

The defendant has the burden to establish a reasonable probability that, but for counsel's deficient performance, he would not have pled guilty. *Murillo*, 927 F.3d at 817.

*Hooper*, 845 F.2d 471, is illustrative.  There, the defendant, who had a history of mental illness, pled guilty in a Virginia court to second-degree murder.  *Id*. at 472.  However, his lawyers failed to obtain a psychiatric evaluation before the defendant's entry of the guilty plea.  *Id*.  Hooper subsequently filed a habeas corpus petition, which the district court denied.  *Id*.  On appeal, the Fourth Circuit noted that the "burden is on Hooper to establish a reasonable probability that if his lawyers had obtained a psychiatric report, he would have rejected the plea agreement" and gone to trial.  *Id*. at 475.

The Fourth Circuit examined a psychiatric report obtained after the guilty plea against the background of the circumstances Hooper faced at the time he decided to plead guilty.  The Court was not persuaded that the report provided evidence sufficient to establish a reasonable probability that Hooper would have declined the plea agreement and gone to trial, even if his counsel had obtained a psychiatric report at the time.  *Id*. at 475-76.  Although the Court concluded that the failure to obtain a psychiatric report fell below the objective standard of reasonableness established by *Strickland*, it was satisfied that Hooper was not prejudiced because there was no reasonable probability that the deficiency changed the outcome of the proceeding.

Of import here, the Fourth Circuit has acknowledged that, on post-conviction, a defendant who has pleaded guilty "has an incentive to claim, in retrospect, that the result of the plea process would have been different regardless of whether that claim is, in fact, true." *Murillo*, 927 F.3d at 815; *see Lee v. United States*, ___ U.S. ___, 137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have [pled] but for his attorney's deficiencies.").  Therefore, "to prevent criminal defendants with bargainer's remorse from simply claiming they would not have taken a deal but for a bit of bad advice," the defendant must "provide evidence of [his] sincerity." *Murillo*, 297 F.3d at 816.  In particular, the defendant "must point to *evidence* that demonstrates a reasonable probability that, with an accurate

understanding of the implications of pleading guilty, he would have rejected the deal." *Id.* (emphasis added). "Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee*, 137 S. Ct. at 1967.

Moreover, "if a defendant alleges that he has accepted a government plea offer based on the erroneous advice of counsel, but entered that plea only after the misadvice 'was corrected by the trial court at the Rule 11 hearing,' then he will not be able to show the necessary causal link between counsel's error and his decision to plead guilty." *Mayhew*, 995 F.3d at 179-80 (quoting *United States v. Foster*, 68 F.3d 86, 88 (4th Cir. 1995)).

These principles guide the analysis.

### IV. Original Petition (ECF 756; ECF 847; ECF 891)

In his original Petition, which is docketed at ECF 756 and refiled at ECF 847 and ECF 891, Smith advances five "grounds" to vacate his conviction and sentence, all premised on ineffective assistance of counsel.

### A. Waiver of *Franks* Hearing

### 1.

Smith contends that Mr. Purpura was ineffective when, after learning from the government that Coconspirator 1 was the SOI referenced in the Tracking Warrant, he waived the *Franks* hearing. ECF 756-1 at 2-18. Smith argues that the failure to identify Coconspirator 1 in the Tracking Warrant Affidavit, or to describe him as a cooperating defendant, constituted a "lie" by TFO Jester and a critical omission that, if pursued at a *Franks* hearing, would have resulted in the suppression of the Tracking Warrant and substantially weakened the government's case. As part of this argument, Smith also contends that Mr. Purpura had a duty, not only to pursue the *Franks* hearing, but also to investigate whether Coconspirator 1 was, in fact, the SOI. ECF 756-1 at 16-

18. This is part of his broader assertion that the information supposedly provided by the SOI was fabricated.

At some point before the motion hearing, the government informed defense counsel that Coconspirator 1 was the SOI. The exact date is not clear, however. ECF 754-2, ¶ 11; ECF 978-2, ¶ 11. In any event, by mid April of 2019, defense counsel decided to forgo the *Franks* hearing. *See* ECF 523. Nevertheless, I shall assume, for the sake of argument, that Mr. Purpura decided to abandon the *Franks* hearing after, and in response to, the disclosure that Coconspirator 1 was the SOI.

In Smith's reply to the government's Second Supplemental Response, filed approximately a year and a half after Smith submitted the Petition, Smith included an Affidavit from Coconspirator 1, dated February 15, 2022. *See* ECF 1040-2 (Coconspirator 1 Aff.). There, Coconspirator 1 avers that he "did not make any identification of the number and text messages in [his] phone as [his] drug supplier Patrick Smith until at least a month after [he] was arrested," *i.e.*, *after* the submission of the Tracking Warrant Affidavit. *Id*. at 2. Smith takes it as a given that this proves that Jester lied in his Trafficking Warrant Affidavit as to the existence of the SOI. *See, e.g.*, ECF 1040 at 5.

### 2.

"When a person claims ineffective assistance based on counsel's failure to file a suppression motion," the court applies a "'refined' version of the *Strickland* analysis." *United States v. Pressley*, 990 F.3d 383, 388 (4th Cir. 2021) (quoting *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 524 (4th Cir. 2016)). "With respect to the performance prong," the court asks "whether the 'unfiled motion would have had some substance.'" *Id*. (quoting *Grueninger*, 813 F.3d at 524-25). "If the motion would have had some substance," then the court asks "whether

reasonable strategic reasons warranted not filing the motion." *Id*.  And, "[t]o satisfy the prejudice

prong, the defendant must show that: (1) 'the [suppression] motion was meritorious and likely

would have been granted, and (2) a reasonable probability that granting the motion would have

affected the outcome of his trial.'" *Id*. (quoting *Grueninger*, 813 F.3d at 525) (alteration in

*Pressley*).  Although this framework was developed for when a defendant proceeds to trial, courts

have also applied it in the context of guilty pleas.  *See, e.g.*, *Higson v. United States*, Cr. No. 2:16-

780, 2021 WL 425894, at *6-7 (D.S.C. Feb. 8, 2021); *Sampson v. United States*, RWT-13-0357,

2018 WL 3533549, at *4 (D. Md. July 23, 2018).

The consideration of "whether reasonable strategic reasons warranted not filing the

motion" reflects that a court must "accord broad deference to counsel's choices in recognition of

the 'wide latitude counsel must have in making tactical decisions.'"  *Pressley*, 990 F.3d at 388

(quoting *Grueninger*, 813 F.3d at 529); *see also Lawrence*, 517 F.3d at 708 ("Keenly aware of the

difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that

courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance.'") (quoting *Strickland*, 446 U.S. at 689).  The contention

implicates the question of whether a *Franks* motion would have been successful.

Ordinarily, an accused is not entitled to an evidentiary hearing to challenge a facially valid

search warrant affidavit.  *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021); *United States

v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 823 (2020); *United States v.

Allen*, 631 F.3d 164, 171 (4th Cir. 2011).  When reviewing an issuing judge's probable cause

finding, consideration is generally confined to the four corners of the warrant application

documents.  *See, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  There is, however, a narrow

exception to this rule, which the Supreme Court established in the seminal case of *Franks v.*

*Delaware*, 438 U.S. 154 (1978). *Franks* established that, under limited circumstances, an accused is entitled to an evidentiary hearing concerning the veracity of statements in an affidavit.

In *Franks*, the Supreme Court established a two-prong test as to what a criminal defendant must show when challenging the veracity of statements made in an affidavit supporting a search warrant. If both prongs are met, the search warrant must be voided and the fruits of the search excluded. *Id*. at 155-56; *see Pulley*, 987 F.3d at 376.

Under the first prong—the "intentionality" prong—the defendant must show that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56. An officer acts with reckless disregard when he fails to "inform the magistrate of facts she subjectively knew would negate probable cause." *United States v. Haas*, 986 F.3d 467, 475 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 292 (2021).

Under the second prong—the "materiality" prong—the defendant must show that, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks,* 438 U.S. at 156. In other words, the false information, whether statements or omissions, must be essential or material to the probable cause determination. *Id.* at 171-72. On the other hand, if the allegedly false statements or omissions are not necessary for the probable cause finding, the accused is not entitled to a *Franks* hearing. *Franks,* 438 U.S. at 155-156; *see United States v. Doyle*, 650 F.3d 460, 468 (4th Cir. 2011) (stating that "false information will only void a warrant if the information was necessary to the finding of probable cause."); *Allen*, 631 F.3d at 171; *United States v. Gary*, 528 F.3d 324, 328 (4th Cir. 2008); *see also United States v. Seigler*, 990 F.3d 331, 334 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 336 (2021); *United States v.*

*McKenzie-Gude,* 671 F.3d 452, 462 (4th Cir. 2011); *United States v. Clenney,* 631 F.3d 658, 663 (4th Cir. 2011).

The two-pronged *Franks* test applies to cases "in which an agent includes affirmatively false statements in a warrant affidavit, [and] also when an agent *omits* relevant facts from the affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016) (citing *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)) (emphasis in *Lull*); *see United States v. Cioni*, 649 F.3d 276, 286 (4th Cir. 2011).  But, "[m]erely identifying factual omissions is insufficient."  *Clenney,* 631 F.3d at 664; *see Haas*, 986 F.3d at 475.  The Fourth Circuit said in *Lull*, 824 F.3d at 115: "Understandably, the defendant's burden in showing intent is greater in the case of an omission because '[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'"  (citing *Colkley*, 899 F.2d at 300).

"To establish entitlement to a *Franks* hearing based on information omitted from the warrant affidavit, [the defendant] [is] required to make a 'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination."  *United States v. Jones*, 942 F.3d 634, 640 (4th Cir. 2019) (citation omitted); *see also United States v. Wharton*, 840 F.3d 163, 168 (4th Cir. 2016).  As to omissions, "the defendant must show that the omissions were '*designed to mislead,* or . . . made in *reckless disregard of whether they would mislead*' and that the omissions were material, meaning that their 'inclusion in the affidavit would defeat probable cause.'"  *Clenney*, 631 F.3d at 664 (quoting *Colkley*, 899 F.2d at 301) (emphasis in *Clenney*).

In *Colkley,* the Fourth Circuit said, 899 F.2d at 301: "For an omission to serve as the basis for a hearing under *Franks,* it must be such that its inclusion in the affidavit would defeat probable cause . . . ."  In other words, to be material under *Franks,* an omission must be "necessary to the

finding of probable cause." *Franks,* 438 U.S. at 156; *Lull*, 824 F.3d at 117; *Colkley,* 899 F.2d at 301. As the *Jones* Court explained, if the omitted facts are inserted into the warrant affidavit, and, as "'revised,'" there is still probable cause, then the defendant is not entitled to a *Franks* hearing. *Jones*, 942 F.3d at 640.

The Fourth Circuit observe in *Lull*, 824 F.3d at 117, that "the significance – or insignificance – of a particular omission to the determination of probable cause may inform [the court's] conclusion regarding the agent's intent.[ ]" But, *Franks* is inapplicable when inclusion of the omitted facts would not have changed the "probable cause calculus. . . ." *Cioni,* 649 F.3d at 286.

The defendant has the burden to establish both prongs by a preponderance of the evidence. *Franks*, 438 U.S. at 156. In light of the "presumption of validity with respect to the affidavit supporting the search warrant," *Franks*, 438 U.S. at 171, establishing entitlement to a hearing has been described as a "heavy" burden. *Moody*, 931 F.3d at 370; *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008).

A showing of falsity "cannot be conclusory and must rest on affidavits or other evidence." *Moody*, 931 F.3d at 370; *see also United States v. Landaverde-Giron*, No. 18-4598, 2022 WL 101941, at *1 (4th Cir. Jan. 11, 2022); *Haas*, 986 F.3d at 474-75. A showing of intentionality or reckless disregard for the truth "is just as demanding." *Moody*, 931 F.3d at 371. Thus, "the defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts." *Moody*, 931 F.3d at 370.

Accordingly, a showing that an officer acted negligently, or that an omission was merely an innocent mistake, is insufficient to warrant suppression. *Franks*, 438 U.S. at 171; *Miller v. Prince George's Cty.*, 475 F.3d 621, 627-28 (4th Cir. 2007) (citing *Franks*, 438 U.S. at 171); *see*

*also United States v. Shorter*, 328 F.3d 167, 170 (4th Cir. 2003) ("[M]ere[] negligen[ce] in recording the facts relevant to a probable-cause determination" is not enough). "[R]eckless disregard in the *Franks* context requires a showing that the affiant personally recognized the risk of making the affidavit misleading." *Pulley*, 987 F.3d at 377. Because "warrant affidavits are 'normally drafted by nonlawyers in the midst and haste of a criminal investigation.' . . . [t]hey must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor 'judged as an entry in an essay contest.'" *Id.* at 372 (internal citations omitted); *see also Seigler*, 990 F.3d at 344-45.

In sum, in order to obtain an evidentiary hearing regarding the integrity of an affidavit in support of a warrant, a defendant must first make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56. As the Supreme Court said, this showing "must be more than conclusory," and "must be accompanied by an offer of proof" in order to overcome the "presumption of [the warrant's] validity." *Franks*, 438 U.S. at 171; *see Clenney,* 631 F.3d at 663.

If a *Franks* hearing is warranted, and the affiant's material perjury or recklessness is established by a preponderance of the evidence, "the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 156). Indeed, if a warrant violates *Franks*, it is not subject to the good faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 923 (1984); *see Doyle*, 650 F.3d at 467.

44

### 3.

Assuming, *arguendo*, that the abandoned *Franks* motion had "some substance" to it with respect to the assertions in Jester's affidavit, Smith's claim founders at the prejudice prong; Smith cannot show that the motion "'was meritorious and likely would have been granted.'" *Pressley*, 990 F.3d at 388 (quoting *Grueninger*, 813 F.3d at 525). The reason for this is straightforward: a key component of the *Franks* standard is materiality—that with the "false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156. And, as indicated, the Court concluded at the motion hearing that the Tracking Warrant was adequately supported by probable cause *without consideration of the SOI*. *See* ECF 681 at 43 ("I'm not even considering [the SOI] in my analysis because I don't think that's helpful."); *see also id*. at 39-40.

At the conclusion of the motion hearing, Smith attempted to raise the matter of the SOI. I reiterated: "I didn't consider the SOI." *Id*. at 49. In other words, even assuming that the information from the SOI was problematic and should have been included in the warrant, I found that the remaining content in the Tracking Warrant Affidavit was sufficient to establish probable cause.

And, this was for good reason, given the circumstances of Coconspirator 1's arrest. As recounted earlier, a massive amount of currency and a large quantity of drugs, as well as drug paraphernalia, was found in Coconspirator 1's hotel room. At the time of his arrest, he possessed a cell phone with text messages to the unknown Phone Number. In the opinion of the agent, the text messages concerned drug dealing. In this context, there was ample probable cause for what the government sought to obtain, which was a tracking warrant as to the Phone Number with which Coconspirator 1 had interacted. Smith's focus on the SOI amounts to much ado about nothing;

whether or not the Phone Number belonged to "Pee" is a red herring in the context of the request for the Tracking Warrant.

Smith spends several pages of the Petition arguing that my decision was wrong as to probable cause, and that without the SOI, there was no probable cause. ECF 756-1 at 9-15. Probable cause is a legal determination. Even if I erred in finding probable cause, however, this does not equate to ineffective assistance of defense counsel, nor does it equate to a viable *Franks* issue. Moreover, Smith explicitly waived the right to contest the validity of my ruling when he pled guilty. *See* ECF 682 at 38-39, 43-44. Thereafter, he declined to pursue a direct appeal, in which, perhaps, he could have tried to challenge the validity of my ruling.

Petitioner relies on *Lull*, 824 F.3d 109, in support of his *Franks* argument. *See, e.g.*, ECF 756-1 at 5-6. In fact, *Lull* demonstrates why the *Franks* motion likely would not have succeeded.

In *Lull*, the district court denied a *Franks* motion regarding an affidavit premised on information from a confidential informant who had purchased drugs from the defendant while working for police, but the affidavit did not disclose that the informant had immediately been arrested for stealing a portion of the money given to him by the police for the sale. 824 F.3d at 112-13. The Fourth Circuit reversed, holding that this omission satisfied the intentionality prong of *Franks*. *Id*. at 115-17. And, as to the materiality prong, the Fourth Circuit found that without the information provided by the informant, "little remain[ed]" in the affidavit to support probable cause. *Id*. at 118-20.

The situation here, as to materiality, is the opposite: the Court expressly ruled that the material in the Tracking Warrant Affidavit was adequate to support probable cause, without consideration of the information from the SOI.

Furthermore, much of Smith's argument is premised on the idea that the disclosure of Coconspirator 1 as the SOI would have weakened the basis for probable cause in the Tracking Warrant Affidavit, leading the Court to grant the Motion to Suppress.  But, this supposition is flawed.

As defendant sees it, the disclosure of Coconspirator 1 as the SOI would have undermined the credibility of Coconspirator 1's information, because of the possibility that the SOI might have provided false information in order to improve his own position, and because of a negative inference that might be drawn from any criminal history.  *See, e.g.*, ECF 756-1 at 5-9.  He offers a continuum of categories of sources of differing levels of credibility, ranging from "Complaining Witness" to "Cooperating Defendant," although it is not clear that this is based on any authority. *Id*. at 6.

For its part, the government argues that Smith is overstating the rigidity of the term "source of information."  ECF 921 at 5.  And, it contends that disclosing Coconspirator 1's identity might actually have *bolstered* the Tracking Warrant Affidavit, because of Coconspirator 1's familiarity with the drug trade and his suppliers, and because Coconspirator 1 would have had an incentive to be truthful to derive any benefits from cooperation.  *See id*. at 5-6; ECF 1031 at 3-4.

I agree with the government.  If I had been told that the SOI was Coconspirator 1, from whom a large quantity of drugs and money was seized, it would have provided credibility to the assertion attributed to SOI as to the Phone Number and its association with "Pee."  Thus, inclusion of this information in the Tracking Warrant Affidavit would not have defeated probable cause. *See Clenney*, 631 F.3d at 664.  And, the parties' competing arguments as to the impact of this information reinforces that counsel did not fall below an objective standard of reasonableness in regard to a strategic decision.

As discussed, an attorney is entitled to deference as to strategic decisions. *Pressley*, 990 F.3d at 388; *Grueninger*, 813 F.3d at 529. As Smith himself avers, by electing to proceed with the motion hearing, he forfeited a seven-year plea offer. ECF 754-2, ¶ 12; *see also* ECF 978-1, ¶ 14. Mr. Purpura, a highly experienced criminal defense attorney, was no doubt acutely aware of the possibility that a *Franks* claim might not have succeeded, as discussed above, but also might have foreclosed the sort of plea that Smith ultimately was offered.

I also note that Smith's complaint that Mr. Purpura failed to pursue the *Franks* hearing directly contradicts his sworn statement, under oath, at the plea colloquy. Smith was explicitly asked at the plea hearing if Mr. Purpura had "failed to do" anything that Petitioner wanted. ECF 682 at 8. Smith mentioned one issue, relating to the T-Mobile data—making clear he put thought into his answer. *Id.* And, he explicitly said that, apart from this one issue, which is not relevant here, Mr. Purpura had done everything that defendant wanted. *Id.* at 9. And, Smith affirmed that he was "fully satisfied" with the services provided by Mr. Purpura. *Id.* at 11.

To be sure, a defendant may develop concerns as to ineffective assistance of counsel after a guilty plea proceeding. But, in this case, the *Franks* issue was one which was already well known to Smith. The motion hearing—at which Smith attempted to raise the SOI issue himself—took place only six days before the plea hearing. So, it was obviously fresh in Smith's mind. Indeed, the motion hearing was discussed at the plea hearing. *See id.* at 2, 7-8, 38-39, 43-44. And, Smith has averred that, prior to the motion hearing, he expected Mr. Purpura to argue the *Franks* point. *See* ECF 754-2, ¶¶ 11-13.

Yet, at the Rule 11 plea hearing, Smith made no mention of anything he wished Mr. Purpura to do in relation to the Motion to Suppress or the motion hearing. And, as discussed, "a defendant's solemn declarations in open court affirming a [plea] agreement . . . 'carry a strong

presumption of verity,'" and "a district court should . . . dismiss any 2255 motion that necessarily relie[s] on allegations that contradict the sworn statements." *Lemaster*, 403 F.3d at 221 (quoting *Blackledge*, 431 U.S. at 74).   A court must be able to rely on a defendant's statements made under oath during a properly conducted Rule 11 plea colloquy.  *United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003).  Notably, "a more lenient approach . . . 'would eliminate the chief virtues of the plea system—speed, economy, and finality.'"  *White*, 366 F.3d at 296 (citation omitted).

On similar grounds, I cannot agree with Smith's argument that Mr. Purpura was ineffective, not only because he withdrew the *Franks* claim, but because he failed to investigate, to Petitioner's satisfaction, whether Coconspirator 1 was actually the SOI, as the government apparently disclosed.  Smith points to certain bases for his claim that Coconspirator 1 could not have been the SOI.  ECF 756-1 at 16-17.  These include that, in the Tracking Warrant Affidavit, the SOI was described as referring to Coconspirator 1 in the third person; that in a later warrant application, another officer indicated a belief that "Pee" supplied cocaine to Coconspirator 1, rather than heroin; and that Jester's subsequent application for the cell-site simulator warrant referred to Coconspirator 1 as a previous cooperating witness.  *Id*.

As mentioned, the Tracking Warrant Affidavit asserted that the SOI identified the Phone Number as belonging to "a male known to him/her *only* as 'Pee.'"  ECF 253-1 at 8 (emphasis added); *see* ECF 681 at 39.  Smith obtained an affidavit from Coconspirator 1, who claimed that he never identified the Cell Phone as that of his drug supplier, Patrick Smith.  *See* ECF 1040-2.  But, a review of Jester's Affidavit reveals that he never said that the SOI identified the supplier by the name of Patrick Smith.  Rather, he was identified only as "Pee," and it was the investigators who had to determine that "Pee" was Smith.

Beyond all of this, the contemporaneous grounds offered by Smith for questioning the government's assertion are largely speculative, and simply do not rise to a level such that, by failing to pursue them, Mr. Purpura fell below an objective standard of reasonableness. *See Haas*, 986 F.3d at 474-75; *Moody*, 931 F.3d at 370, 372. As discussed, Smith's Motion to Suppress was ultimately denied because of the information in the Tracking Warrant Affidavit, exclusive of the SOI. Smith's arguments also run headlong into his sworn statement at the plea colloquy that, with the exception of the T-Mobile issue, Mr. Purpura had done everything defendant wanted. *See* ECF 682 at 8-11. And, the Court must take care to "avoid the distorting effects of hindsight" when evaluating ineffective assistance claims. *Morris*, 917 F.3d at 823.

In sum, I reject Smith's claim that Mr. Purpura rendered ineffective assistance of counsel in his handling of the *Franks* motion and the Tracking Warrant Affidavit.

### B. GPS Tracking

Defendant contends that Purpura was ineffective for failing to move to suppress what Smith describes as an illegally placed GPS device attached to his vehicle. ECF 756-1 at 19-23. As best the Court can tell, Smith is convinced that investigators placed a GPS tracking device on his Honda Odyssey prior to applying for a warrant to do so on September 26, 2017. Smith argues that Purpura should have moved to suppress evidence obtained from this alleged warrant, which he asserts encompasses a wide variety of evidence crucial to the case. ECF 756-1 at 22.

Petitioner offers a few reasons for believing that such a tracking device exists. He points to the following language from Jester's affidavit in support of his October 11, 2017, application for the cell-site simulator, ECF 938 at 5 (emphasis added):

15. Investigators continued to monitor the GPS location of SMITH's CELLPHONE-1 and it returned to the Baltimore area at approximately 11:36 a.m. on September 18, 2017 and traveled through Baltimore City and Baltimore County, before arriving in the 1400 block of Odenton Road in Odenton, Maryland at

approximately 2:06 p.m. SMITH's CELLPHONE-1 remained in the area of the 1400 block of Odenton Road for approximately one hour and fifteen minutes, then left at approximately 3:21 p.m. Investigators believe that SMITH resides at 1412 Odenton Road, Odenton, Maryland based on GPS location data from SMITH's CELLPHONE-1, *GPS location information from SMITH's vehicle*,[ ] because SMITH reported this address at his residence during a previous drug arrest, and additionally because vehicles parked outside of this residence during physical surveillance were in the name of Patrick SMITH, with a listed address of 1412 Odenton Road.

*See also* ECF 253-2 (the October 11, 2017, warrant and application) at 11.

Defendant appears to interpret the italicized phrase to indicate that investigators had placed a GPS tracker on his vehicle as of September 18, 2017, and believed at that time that Smith lived at the Odenton Road address because of this tracking data. Thus, he regards this phrase as a smoking gun, with the government flagrantly including evidence of its own illegal surveillance in a warrant application. A commonsense construction of this paragraph, however, makes clear that Jester was averring that, as of October 11, 2017, investigators believed that Smith resided at the Odenton Road address because of GPS vehicle tracking data, among various types of evidence. And, this date is several weeks *after* investigators secured a warrant for the tracker.

Petitioner also claims that, when investigators followed Smith to the Johns Hopkins Hospital Caroline Street parking garage on September 18, 2017, they located Smith's Honda Odyssey van more quickly than would be expected. ECF 756-1 at 20-21; ECF 874 at 20-22. The only explanation, according to Smith, is that the van was being tracked. But this is pure speculation, and disregards other, obvious explanations for the investigators' speed, such as the fact that they were already (lawfully) tracking the Cell Phone.

In short, this argument is premised on little more than conclusory and unsupported speculation. *Cf. United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) ("'[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further

investigation by the District Court.'") (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d

Cir. 2000)).   Applying the modified *Strickland* framework, Petitioner has not shown that any

motion to suppress would have had some substance, much less have been meritorious and likely

to be granted.   *See Pressley*, 990 F.3d at 388; *Grueninger*, 813 F.3d at 524-25.   Furthermore, as to

prejudice, although Smith asserts that broad categories of evidence would be implicated by the

suppression of any illegal GPS tracking (*see* ECF 756-1 at 22), he has not demonstrated in any

meaningful way that suppression of any GPS tracking data would have affected his decision to

plead guilty.

### C. Medication-Induced Impairment

In his third contention, Smith argues that Mr. Purpura was ineffective for permitting him

to plead guilty while his ability to do so was allegedly impaired by what Petitioner describes as a

"cocktail of prescription medication[s]."   ECF 756-1 at 27.   According to Smith, once Petitioner

became agitated during the proceedings and informed Mr. Purpura during the recess that he did

"not feel right" (*id.* at 28), Mr. Purpura had a duty to investigate whether the medications he listed

at the beginning of the plea hearing affected his judgment.   *Id.* at 24-29.

As already stated, "'a guilty plea is a grave and solemn act to be accepted only with care

and discernment[.]'"   *United States v. Fisher*, 711 F.3d 460, 464 (4th Cir. 2013) (quoting *Brady v.

United States*, 397 U.S. 742, 748 (1970)) (alterations in *Fisher*).[12]   "Thus, a guilty plea 'not only

must be voluntary but must be [a] knowing, intelligent act[ ] done with sufficient awareness of the

relevant circumstances and likely consequences.'"   *Id.* (quoting *Brady v. United States*, 397 U.S.

at 748) (alternations in *Fisher*).   But, "in-court representations from the defendant [as to whether

---

[12] Because this Memorandum Opinion also discusses *Brady v. Maryland*, 373 U.S. 83
(1963), I will refer to each "*Brady*" case by its full name.

a plea is knowing and voluntary] are treated as conclusive with regard to the validity of the plea and may not be controverted later absent some compelling reason." *Savino v. Murray*, 82 F.3d 593, 603 (4th Cir. 1996); *see also Bowman*, 348 F.3d at 417.

Of relevance here, "a defendant claiming that he was incompetent to plead guilty must show 'that his mental faculties were so impaired by drugs when he pleaded that he was incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights and of realizing the consequences of his plea.'" *United States v. Damon*, 191 F.3d 561, 565 (4th Cir. 1999) (quoting *United States v. Truglio*, 493 F.2d 574, 578 (4th Cir. 1974)). And, "when an answer [at a plea hearing] raises questions about the defendant's state of mind, the court must broaden its inquiry to satisfy itself that the plea is being made knowingly and voluntarily." *Id.*; *see also United States v. Shiflett*, 258 Fed. App'x 560, 561-62 (4th Cir. 2007) ("When a district court is informed that a defendant is under the influence of medication, the court has a duty to make further inquiry into the defendant's competence to plead guilty. When a defendant's answers raise a 'red flag' regarding his mental state, the court must expand its inquiry to ensure that the plea is being made knowingly and voluntarily.") (internal citations omitted).

The Court rejects Smith's claim. At the beginning of the plea hearing, the Court asked Smith if he had taken any medications within the previous 48 hours. ECF 682 at 4-5. When defendant answered yes, the Court discussed with him what they were and for what condition. *Id.* at 5. Defendant represented that he took the medications "daily." *Id.* When the Court asked if there was "anything about these medications" that "somehow affect[s] [defendant's] ability to know what [he is] doing here today," defendant said: "Not to my knowledge." *Id.* at 5-6. The Court then asked Mr. Purpura if he was satisfied that Smith was capable of proceeding, to which counsel responded that, based on his more than twenty meetings with Smith, he was "bright" and

"alert," and counsel was "quite confident" that defendant was competent to proceed with the plea hearing. *Id*. at 6.

And, the Court also observed that Smith "appear[ed] alert and oriented . . . ." *Id*.  I also pointed out that, just a few days earlier, at the motion hearing, defendant was alert, because he voiced his disagreement with the Court's ruling.  *Id.* at 6.  My point in making that observation was obvious:  at the time of the motion hearing, the defendant would have been on the same medications that he took on the day of the plea hearing.  And, those medications did not previously impair defendant's thinking, given his vocal objection to the ruling at the hearing.  In addition, I observed that Smith was "smiling" when I mentioned his conduct at the motion hearing.  This signaled to me that my point was not lost on Mr. Smith.  Indeed, I stated: "[S]o he gets what I'm saying as well." *Id*. at 6.

From my comment about the smile, Smith complains in the Petition that I determined that he was competent based on "a smile." ECF 756-1 at 28.  This is completely incorrect.  I determined that Smith was capable of proceeding based on my overall assessment of Petitioner, and his answers to my questions, which suggested no cause for concern.  To the contrary, I noted, in effect, that Smith was quite astute.

Indeed, Smith was responsive to my questioning throughout the hearing.  And, he asked his own questions of the Court and conferred with counsel, indicating his lucidity and understanding of the proceedings. *See id*. at 7-12, 16, 19, 23, 27-29. *See Trent v. United States*, No. 3:08-CR-350, 2014 WL 4245963, at *3 (E.D. Va. Aug. 24, 2014) ("[Defendant's] extensive commentary during the plea hearing gave neither defense counsel nor the court any reason to doubt his mental acuity or understanding of that proceeding.").

However, at one point, I thought that Smith appeared agitated.  For that reason, I asked him if he wanted a recess, to which he said yes.  *Id*. at 33.  Smith avers that during this break, he told Mr. Purpura that he felt "high," "like [he] was hallucinating," and "like none of this was real to [him]."  ECF 754-2, ¶ 18.  But, notably, he does not claim that he ever expressed any concern to Mr. Purpura that any of his medications were the cause of what he was experiencing.  And, he had previously stated under oath that he took these medications "daily" and that, as far as he knew, none of them affected his ability to understand the proceedings.  ECF 682 at 5-6.  Moreover, there was nothing about defendant's behavior that sparked a concern on the Court's part that Smith somehow lacked free will or the capacity to understand what was taking place.

It is true that, as Smith points out (*see, e.g.*, ECF 843 at 23-24), he used the caveat "[n]ot to my knowledge" when answering this question.  ECF 682 at 6.  But, given that he testified to taking the medicines daily, it is reasonable that Mr. Purpura would have assumed Smith was familiar with their side effects.  Furthermore, given Petitioner's participation in the plea hearing, and the passionate approach he has taken throughout the case to safeguarding his rights, it is also reasonable that Mr. Purpura would have concluded that Smith's emotional state was the result of the gravity of the proceedings, and not a medication issue.

At the end of the recess, I asked Smith if he had "had enough time."  ECF 682 at 33.  He replied: "I'm good.  I'm good."  *Id*.  Likewise, Mr. Purpura indicated that Smith was ready to resume.  *Id*. at 34.  And, I told Smith that "if there was ever any doubt in [his] mind" about how he wanted to proceed, he should "speak up."  *Id*. at 34.  He responded that he wished to go forward.  *Id*. at 34-35.  Moreover, he subsequently affirmed that he wished to plead guilty, and that he was pleading guilty "freely and voluntarily."  *Id*. at 45.  And, I asked Smith "one more time" if he "still

wish[ed] to plead guilty." *Id*.  He said, "I do." *Id*.  Thereafter, I found that Smith was "fully competent, alert, oriented, and capable of entering an informed plea of guilty." *Id*.

In other words, even if Mr. Purpura should have inquired further as to Smith's condition, the Court's questioning of Smith, as to whether he was ready and able to proceed, resolves the claim.  As the Fourth Circuit said in *Savino*, 82 F.3d at 603: "[I]n-court representations from the defendant [as to whether a plea is knowing and voluntary] are treated as conclusive with regard to the validity of the plea and may not be controverted later absent some compelling reason." Petitioner has adduced no compelling reason here.

Petitioner relies heavily on *Damon*, 191 F.3d 561, to support his claim of impairment.  *See, e.g.*, ECF 756-1 at 24-25.  But, *Damon* is readily distinguishable.

In *Damon*, in the period between signing a plea agreement and the plea hearing, the defendant attempted suicide, was taken to a hospital, and underwent a psychiatric evaluation.  191 F.3d at 562-63.  Three days later, he was taken to court for his plea hearing, but told the court that he no longer wanted to plead guilty.  *Id*. at 563.  A few days later, however, he "returned to court," and the prosecutor told the court that the defendant wished to plead guilty.  *Id*.  The district court began the plea colloquy, asking the defendant if he was taking any sort of medication.  *Id*.  The defendant answered that he was taking an antidepressant after the suicide attempt, and his counsel stated that, per the hospital's records, the medication could cause "'impaired judgment.'"  *Id*.

Instead of asking any follow up questions, the court simply moved on to the next topic in the colloquy, asking the defendant if he had had an opportunity to review the plea agreement.  *Id*. The Fourth Circuit ruled: "This information should have raised a red flag for the district court as to Damon's competence to plead guilty."  *Id.* at 565.  In its view, the district court "erred when it failed to inquire about what effect, if any, Damon's medication had on his ability to make a

56

voluntary plea and to understand the consequences." *Id.* Therefore, the Fourth Circuit remanded the case to the district court to determine if the medication might have rendered the defendant incompetent to plead guilty. *Id.*

Here, unlike in *Damon*, the Court did not proceed to the next topic of the plea colloquy, after learning that defendant took certain medications. To the contrary, the Court inquired as to the drugs, the conditions for which they were taken, and whether the drugs affected Smith's ability to understand the proceedings. ECF 682 at 5-6. And, the Court also asked defense counsel if he was satisfied that Smith was capable of proceeding. *Id.* at 6. In other words, the Court "broaden[ed] its inquiry to satisfy itself that the plea [was] being made knowingly and voluntarily." *Damon*, 191 F.3d at 565. Smith stated that, so far as he knew, the medications did not affect his ability to understand what was occurring, and his counsel attested to his competence. *Id.*

Furthermore, the Court noted that the defendant had appeared fully alert and engaged just a few days earlier, when he was taking the same medications. And, after the recess ended at the plea hearing, the Court repeatedly confirmed with Smith that he still wished to proceed and to plead guilty. *See* ECF 682 at 34-35, 45-46. Moreover, the particular circumstances leading up to the plea hearing in *Damon*—that is, a suicide attempt, followed by hospitalization and psychiatric evaluation—are noticeably absent here.

I note that the government's briefing missed the mark in one respect. Smith suggests that "one of the side effects" of Neurontin, a medication that he was prescribed, "is that it changes [his] mental state." ECF 754-2, ¶ 16. The government argues there is "scant evidence that Smith took Neurontin that day," pointing out that Smith did not identify the drug during his plea hearing, and that it was not among the medications reported to BOP when Smith entered custody. ECF 921 at 6; *see* ECF 923-1 (the BOP record). But, as a basic Google search reveals, Neurontin is a brand

name for Gabapentin, which helps to control partial seizures.  *See, e.g.*, *Gabapentin*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/drugs/21561-gabapentin (last updated Jul. l, 2021). And, in fact, Smith mentioned Gabapentin as one of his medications during the plea colloquy (*see* ECF 682 at 5); it also is mentioned in his BOP record.  *See* ECF 923-1 at 2-3.

However, to the extent of any error by the government, this does not affect the overall analysis.  Smith has not demonstrated that he received ineffective assistance of counsel.  Nor has he raised any concern regarding his guilty plea as knowing and voluntary.  Instead, his conduct smacks of post hoc assertions consistent with "bargainer's remorse."  *Murillo*, 297 F.3d at 816. Indeed, at sentencing, defense counsel observed as to Smith that he is "[o]ne of the sharpest clients [he's] ever represented, and still is."  ECF 684 at 2-3.

### D. Failure to File Appeal

As originally filed, "Ground Four" of the Petition asserted that, following defendant's guilty plea, Smith instructed Mr. Purpura to file a notice of direct appeal, but Mr. Purpura did not do so.  ECF 756-1 at 29; *see also* ECF 754-2, ¶¶ 22-24.  As discussed, the government conceded that, because resolving this argument would likely require an evidentiary hearing, it was in the interest of judicial economy to grant the Petition, in part, to permit the appeal.  ECF 809 at 14-15. I agreed, and amended the judgment so as to allow Smith to appeal.  *See* ECF 819; ECF 821.  And, at the Court's direction, Mr. Purpura filed a notice of appeal in order to preserve Smith's appellate rights.  I attempted to explain all of this to Smith in correspondence of December 17, 2020 (ECF 850) and January 20, 2021.  ECF  880.

Nevertheless, Smith decided that he did not wish to pursue a direct appeal.  He explained to the Fourth Circuit: "His 2255 Motion is how Smith is going to proceed in the above listed case." ECF 876 at 2.  The Fourth Circuit granted Smith's request to withdraw his appeal.  ECF 870.  And,

I wrote to Smith: "[O]n the basis of what has occurred, there is no merit to your fourth contention." ECF 880 at 1.

It is unclear if Smith is attempting to pursue his appeal claim at this juncture. His reply to the government's Opposition, which was filed on December 15, 2020, continued to argue the point. ECF 843 at 25. But, his supplemental § 2255 Petition, which was filed on December 16, 2020, omits this contention. *See* ECF 847. Regardless, in light of what transpired, I will reject any argument concerning ineffective assistance based on defense counsel's failure to file an appeal.

### E. Counsel "Colluded" with the Government

Ground Five is titled: "Counsel Was Ineffective For Colluding With The Government And Abandoning His Role As Counsel for Mr. Smith." ECF 756-1 at 29. Petitioner essentially argues that, by waiving the *Franks* hearing and not informing the Court that the SOI was Coconspirator 1, Mr. Purpura "colluded" with the government. *Id*. at 29-32. And, he contends that Mr. Purpura's conduct effectively constituted a constructive denial of his right to the assistance of competent counsel. *Id*.

An allegation of "collusion" on the part of counsel is a serious one. Here, it is not backed up by any substance. Much of Ground Five simply rehashes the arguments in Ground One, which I have already addressed.

As for the claim of constructive denial of competent counsel, nothing could be further from the truth. "[A] constructive denial of counsel results from circumstances where 'the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided' at all." *United States v. Moussaoui*, 591 F.3d 263, 289 (4th Cir. 2010) (quoting *United States v. Chronic*, 466 U.S. 648, 654 n.11 (1984)) (second alteration in *Moussaoui*). Mr. Purpura not only briefed and argued the Motion to Suppress, but he also negotiated with the government a plea deal that resulted

in a sentence that I characterized at the time as "lenient" and a "gift."  ECF 684 at 23-24, 29-30.

No serious claim of constructive denial of counsel, nor of "collusion," can be maintained.

### V. Amendments to the Petition

As noted, Smith has moved to amend the Petition six times since it was originally filed.
*See* ECF 919; ECF 978; ECF 1003; ECF 1008; ECF 1020; ECF 1022.  Amendment Two (ECF
978) seeks to add the Affidavit of Mr. Vasiliades, which has been cited above.  Aside from this
submission and possibly Amendment One, each amendment seeks to assert new, albeit in some
cases related, arguments as to why Petitioner's conviction must be vacated.

The government has responded to the amendments.  ECF 921; ECF 1031.  It does not
object to including Mr. Vasiliades' Affidavit, although it does not concede that this Affidavit
changes anything.  *See* ECF 1031 at 2.  Therefore, I shall grant ECF 978.  However, the
government objects to the remaining amendments.

Rule 15 of the Federal Rules of Civil Procedure, governing amendments in civil litigation,
applies in § 2255 proceedings.  *See, e.g.*, *Mayle v. Felix*, 545 U.S. 644, 654-55 (2005); *United
States v. MacDonald*, 641 F.3d 596, 616 n.12 (4th Cir. 2011).  The government argues that the
amendments should be rejected under Rule 15 because of the lengthy delay between the Petition
and each amendment (except Amendment One), and because the amendments would be futile.

I note that although the government has generally cited Petitioner's delay as a reason to
reject the amendments, it has *not* mounted any argument as to the statute of limitations for § 2255.
*See, e.g.*, *United States v. Nunez-Garcia*, ___ F.4th ___, 2022 WL 1160388, at *3 (4th Cir. Apr.
20, 2022).  Nor does it claim that the amendments do not relate back to the original Petition.  *See,
e.g.*, ECF 1031 at 2-3.  And, the § 2255 statute of limitations is not jurisdictional; the Court is not
required to raise the issue if the government has not.  *See, e.g.*, *Holland v. Florida*, 560 U.S. 631,

645-49 (2010); *Day v. McDonough*, 547 U.S. 198, 205-10 (2006); *Hill v. Braxton*, 277 F.3d 701, 705-06 (4th Cir. 2002); *Harris v. Hutchinson*, 209 F.3d 325, 329-30 (4th Cir. 2000).[13]

Under Rule 15, the Court may reject an amendment for futility or "'undue delay.'" *Booth v. Maryland*, 337 Fed. App'x 301, 312 (4th Cir. 2009) (per curiam) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). However, "mere delay in moving to amend is 'not sufficient reason to deny leave to amend,' it is only when '[t]he delay [i]s accompanied by prejudice, bad faith, or futility.'" *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4th Cir. 1987) (quoting *Johnson v. Oroweat Foods Co*., 785 F.2d 503, 509-10 (4th Cir.1986)) (alterations in *Island Creek Coal*). Here, the government asserts no prejudice, and only mounts a cursory argument as to delay.

Futility is a ground to reject an amendment. In my view, however, in the context of a § 2255 Petition filed by a pro se prisoner, the better course is to grant leave to amend and address each amendment squarely on the merits. Because futility is essentially an examination of the merits of a proposed amendment, either approach amounts to the same thing.

Therefore, I shall grant Smith's remaining motions to amend the Petition: ECF 919, ECF 1003, ECF 1008, ECF 1020, ECF 1022. However, I conclude that the arguments in the amendments do not provide a basis to grant the Petition, as amended.

### A. Amendment One (ECF 919)

In Amendment One, Smith states that he would "like to amend [his] Motion to include the October 11, 2017, sworn search warrant application by Craig Jester," which was used to obtain the cell-site simulator. ECF 919 at 2. Smith states that the application is "very material to this case . . . and it should assist the Court in making a fair and just decision." *Id*. But, it is unclear if

---

[13] Although these decisions concern 28 U.S.C. § 2254, courts have applied the same principles in the § 2255 context. *See, e.g.*, *MacDonald*, 641 F.3d at 616 n.12; *Way v. United States*, DKC-07-2183, 2011 WL 915339, at *3 n.5 (D. Md. Mar. 15, 2011) (citing cases).

Smith actually intends to mount a new claim or argument relating to the cell-site simulator, or merely ensure that the warrant application is considered when evaluating the Petition.

Regardless, Amendment One does not actually include any specific argument relating to, or aimed at, the cell-site simulator. And, the government asserts: "In reviewing the record . . . it does not appear that investigators ever used the cell-site simulator or obtained any information or evidence from it. Investigators already had Smith's location information from the other tracking and wiretap warrants. Moreover, investigators do not appear to have used any cell-site simulator information in any subsequent warrant affidavits." ECF 921 at 7. Smith does not contest this claim or argue Amendment One at all, in the relevant reply. *See* ECF 938.

If Amendment One seeks to make a new argument, the argument is conclusory and must fail. *See Dyess*, 730 F.3d at 359. To the extent Smith is seeking to lodge an ineffective assistance claim, he cannot show prejudice if the cell-site simulator was not actually used. And, if defendant is mounting some other collateral attack, he did not do so on direct appeal, and cannot show cause and actual prejudice. I will reject the argument advanced in Amendment One.

### B. Amendment Three (ECF 1003)

Amendment Three is the most significant of Smith's six amendments. In Amendment Three, Smith explains that he is making three new claims: that his plea was not intelligent and voluntary due to "misrepresentation, lies, and egregiously impermissible misconduct" by Jester and the government; that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose information as to investigations and findings of wrongdoing against Jester in other cases; and that Mr. Purpura was ineffective for telling Smith that if there was a "substantial finding or guilty verdict" against Jester, the plea could be withdrawn. ECF 1003

at 1.  However, in practice, Smith's argument in Amendment Three blends these points, making it difficult to evaluate them.

### 1.   GTTF Allegations

Smith makes various assertions concerning misconduct by Jester in other cases, as part of the disgraced Gun Trace Task Force ("GTTF"), once a unit in the BPD.  The GTTF scandal was an egregious and wide-ranging example of police misconduct in which members of the BPD were charged with crimes including, as described by a recent and comprehensive independent investigation into the scandal, "robberies committed during street stops, traffic stops, and residential searches; false affidavits and police reports submitted to facilitate their crimes; and massive overtime fraud accomplished through lying about the hours worked by the BPD members."  MICHAEL R. BROMWICH ET AL., ANATOMY OF THE GUN TRACE TASK FORCE SCANDAL: ITS ORIGINS, CAUSES, AND CONSEQUENCES at i (Jan. 2022) (the "GTTF Report").[14]  I briefly summarize Smith's allegations, to the extent relevant to the Petition.

Smith asserts, at various points in Amendment Three and in the relevant reply (ECF 1040), that Jester "has been charged in Federal Court" (ECF 1003 at 2); is on a "Do-Not-Call-List" (*id.*); "has a Trial in Federal Court" (*id*); "has been suspended and has a Federal Indictment and Trial pending against him" (*id.*); "has had a substantial finding of wrongdoing by Internal Affairs and has been suspended from the [BPD] indefinitely" (ECF 1040 at 5); "has been suspended indefinitely and has pending criminal charges" (*id*. at 7); "has committed criminal misconduct in a variety of cases" (*id*. at 11); and "is in the heart" of the GTTF scandal (*id*. at 14).  Smith also

---

[14] Smith has included the entire GTTF Report with his latest reply. *See* ECF 1040-3 to ECF 1040-9. The GTTF Report was commissioned by the Baltimore City Solicitor and the BPD, approved by Chief Judge Bredar as part of a consent decree governing the BPD, and conducted by the law firm Steptoe & Johnson LLP. *See* GTTF Report at 6-9. The GTTF Report is available at https://www.gttfinvestigation.org/.

offers a timeframe, *id.* at 5: "Over a year after Defendant pled guilty, between 2020 and 2021, Agent Jester was suspended for wrongdoing and indicted in federal court (trial is pending)"

Smith avers that the government informed Mr. Purpura that "Jester was being investigated," but did not provide details.  ECF 1003-1, ¶ 3.  And, Mr. Vasiliades avers that, prior to the Motion to Suppress hearing, the government informed Mr. Purpura that Jester "had been placed on paid leave and an investigation of his colleagues was pending."  ECF 978-1, ¶ 13.  Further, Mr. Vasiliades asserts that in March of 2020, he and Smith learned that Jester was "suspended without pay for his involvement with Trenell Murphy's arrest."  *Id.* ¶ 18.  The Court has not been provided with further information or documentation as to these claims of investigation and suspension.

As to Trenell Murphy's arrest, this incident is described in the GTTF Report.  *See* GTTF Report at 110-12.  Jester was assigned to the "VCID Eastside 6" squad that arrested Murphy in 2009, and seized approximately 40 kilograms of cocaine, worth about $1 million.  *Id.* at 110-11.  Murphy was sentenced to twenty years of imprisonment.  *Id.* at 111.  In 2019, it emerged that three members of the VCID Eastside 6 squad—Keith Gladstone, Ivo Louvado, and Victor Rivera—stole a portion of the drugs and sold them, dividing the proceeds among themselves.  *Id.* at 111-12.  Gladstone, Louvado, and Rivera have since been convicted.  *See id.* at 279-80.  Murphy's sentence has been reduced to 15 years by joint motion of Murphy and the government.  *Id.* at 111; *see* ELH-09-558, ECF 94.  Jester and Wayne Jenkins, a BPD officer convicted in the GTTF scandal, coauthored the affidavits and police reports regarding the operation.  GTTF Report at 111.  But, the GTTF Report does not indicate that Jester was involved in the sale of the drugs.

Smith has included an email of November 16, 2021 from Mr. Vasiliades to Petitioner that appears to contain the "Do Not Call" list.  ECF 1003-2.[15]  This list does, indeed, include Jester, with the annotation "GTTF – Trial. Federal."  *Id*. at 2.  Smith has also provided a November 16, 2021, email from Mr. Purpura to Assistant U.S. Attorneys Christine Goo and James Wallner.  ECF 1003-3.  In the email, Mr. Purpura notes that he "do[es] not and will not continue to represent Mr. Smith," but that he received a letter from Smith's family suggesting that Jester is on the Do Not Call list in Baltimore City.  *Id*.  He states that he has attached the Do Not Call list, and "thought it important to bring to your attention."  *Id*.

However, as to Smith's assertions regarding charges or a trial, as far as the Court is aware Jester has not been indicted or charged in federal court related to the GTTF scandal.  *See* GTTF Report at 264-80 (describing cases against GTTF-related defendants); *see also* ECF 1031 at 5 ("[T]o the government's knowledge, the tracking warrant affiant [Jester] has not been charged in any federal case.").

To be clear, no evidence or documentation has been provided to the Court indicating that any investigation or discipline into Jester is related to this case or involves Smith.  Smith sometimes conflates these issues in his briefing, but his various allegations regarding Jester's conduct in this case are distinct.

---

[15] The "Do Not Call" list published by the Baltimore City State's Attorney "includes those police officers who," according to the State's Attorney, "have engaged in conduct that renders their potential testimony unreliable or non-credible." *State's Attorneys Mosby and Braveboy Publish 'Do Not Call' Lists*, BALTIMORE CITY STATE'S ATTORNEY (Oct. 29, 2021), https://www.stattorney.org/media-center/press-releases/2428-state-s-attorneys-mosby-and-braveboy-publish-do-not-call-lists.

### 2. Smith's *Fisher* Argument

Smith's primary argument in ECF 1003 appears to be that, because of misrepresentations and misconduct by Jester and the government, his plea was not intelligent and voluntary. This claim is not one of ineffective assistance of counsel. Instead, it is premised on the doctrine articulated by the Fourth Circuit in *Fisher*, 711 F.3d 460.

A defendant must know the direct consequences of his guilty plea in order for it to be knowing and voluntary. *Brady v. United States*, 397 U.S. at 755. The Supreme Court has explained that under Fed. R. Crim. P. 11, "the district court is required, as a precondition to acceptance of a guilty plea, to inform the defendant in person of the specified rights he or she may claim in a full criminal trial and then verify that the plea is voluntary by addressing the defendant." *Gonzalez v. United States,* 553 U.S. 242, 247 (2008). This "requirement is satisfied by a colloquy between the judge and the defendant, reviewing all the rights listed in Rule 11." *Id.*

In evaluating the validity of a guilty plea, "courts look to the totality of the circumstances surrounding [it], granting the defendant's solemn declaration of guilt a presumption of truthfulness." *Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir. 2003) (citation omitted). Indeed, "[a] defendant's solemn declarations in open court affirming [a plea] agreement . . . 'carry a strong presumption of verity.'" *United States v. White*, 366 F.3d 291, 295 (4th Cir. 2004) (quoting *Blackledge v. Allison*, 431 U.S. 63, 76 (1977)). And, "because they do carry such a presumption, they present 'a formidable barrier in any subsequent collateral proceedings.'" *White*, 366 F.3d at 295-96 (quoting *Blackledge*, 431 U.S. at 74).

Here, as discussed, Smith affirmed at the plea colloquy that he was pleading guilty freely and voluntarily, and because he was guilty. And, he made these acknowledgements after careful review by the Court of the Plea Agreement's implications. A court must be able to rely on a

defendant's statements made under oath during a properly conducted Rule 11 plea colloquy.  *Bowman*, 348 F.3d at 417.

Under *Fisher*, to "set aside a plea as involuntary," Smith, "who was fully aware of the direct consequences of the plea[,] must show that (1) 'some egregiously impermissible conduct (say, threats, *blatant misrepresentations*, or untoward blandishments by government agents) antedated the entry of his plea' and (2) 'the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice.'"  *Fisher*, 711 F.3d at 465 (emphasis in *Fisher*) (quoting *Ferrera v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)).

The defendant in *Fisher* pled guilty to unlawful possession of a firearm by a felon.  *Id.* at 463.  Mark Lunsford, a Baltimore City TFO with the DEA, obtained a search warrant for the defendant's residence and vehicle.  *Id.*  Upon execution, officers found a loaded handgun and crack cocaine.  *Id.*  The search warrant was premised solely on a sworn affidavit by Lunsford, in which Lunsford averred that a confidential informant, whom he described as reliable, had told him that the defendant distributed narcotics from his residence and vehicle and had a handgun in his residence, and provided extensive other information.  *Id.*  One year later, Lunsford was charged with various offenses relating to his duties as a DEA officer, including "falsely attributing information to a confidential informant with whom he was splitting reward money."  *Id.*  Lunsford pled guilty, admitting to various instances of falsely identifying a confidential informant.  *Id.*  As to the defendant's case, Lunsford admitted that the confidential informant he had identified in the affidavit actually had no connection to the case, and another individual was the real informant.  *Id.*

The defendant moved to vacate his guilty plea based on Lunsford's "criminal misconduct."  *Id.*  The district court denied the motion, but the Fourth Circuit reversed, in a two-to-one decision.  *Id.* at 463-64.  The Fourth Circuit remarked that the case presented "highly uncommon

circumstances in which gross police misconduct goes to the heart of the prosecution's case." *Id.* at 466. Lunsford's extensive false testimony secured the search warrant, which "enabled the search of Defendant's home, where evidence forming the basis of the charge to which he pled guilty was found." *Id.* The Fourth Circuit concluded, *id.* at 465, that this constituted "impermissible government misconduct" within the meaning of *Brady v. United States*, 397 U.S. 742; *see Fisher*, 711 F.3d at 465-67.

The Fourth Circuit also concluded that this misconduct "induced [the defendant] to plead guilty." *Id.* at 467. He was required to show "'a reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial,'" as evaluated using an objective approach. *Id.* (quoting *Ferrera*, 456 F.3d at 294). The Court noted that the government had presented the Lunsford affidavit to the defendant, who used it in informing his decision to plead guilty. *Id.* Defense counsel declared under oath that she believed the warrant to be a strong one and, on that basis, advised the defendant to plead. *Id.* at 466. But, had the defendant known about Lunsford's "affirmative misrepresentation and felonious behavior," his entire approach to the case would have been different. *Id.* at 467. He would have filed a motion to suppress, which might have succeeded; even if it had not, it would have influenced the defendant's decision to plead guilty, because Lunsford's credibility would have been a key question at trial. *Id.* at 469.

In these "egregious circumstances," according to the Fourth Circuit, the defendant's plea was involuntary and should have been vacated. *Id.* The Court determined that it did not matter that neither the defendant nor the government knew of Lunsford's lies at the time of Fisher's plea. *Id.* at 467, 469-70. Furthermore, the Court rejected the suggestion that the defendant had to claim

actual innocence in order to find the plea invalid, although it described a claim of innocence as "perhaps an important factor." *Id.* at 467.

In addition, the *Fisher* Court observed that setting aside Fisher's plea "is supported by the important interest of deterring police misconduct." *Id.* at 469. It reasoned that if a defendant cannot challenge "subsequently discovered police misconduct," then "officers may be more likely to engage in such conduct, as well as more likely to conceal it to help elicit guilty pleas." *Id.* And, it acknowledged that "allowing [a] defendant's guilty plea to stand when a police officer intentionally lies in a search warrant affidavit undermines public confidence in our judicial system." *Id.* at 470.[16]

Smith seeks to apply the principles of *Fisher* to his case, and to the government misrepresentation and misconduct he asserts. But, the facts of the two cases are strikingly different. It is also difficult to evaluate Smith's contention because it is unclear what misrepresentation or misconduct he argues renders his plea involuntary. Amendment Three suggests several different possibilities.

Sometimes Smith suggests the misrepresentation was that Jester did not disclose in the Tracking Warrant Affidavit that Coconspirator 1 was the SOI. *See, e.g.*, ECF 1003 at 2, 3. If this is his claim, it founders for a simple reason: the government disclosed the SOI's identity to Smith prior to his decision to plead guilty. ECF 754-2, ¶ 11. Indeed, this is the basis of many of Petitioner's other claims. If this is so, then this alleged misrepresentation could not have rendered Smith's plea involuntary, because he knew about it at the time he entered the plea.

---

[16] Because the Court resolved the case under *Brady v. United States*, 397 U.S. 742, the Fourth Circuit did not consider the defendant's alternative argument that the government had violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83. *See Fisher*, 711 F.3d at 469.

At other points, Smith indicates that the misconduct was that Jester allegedly placed an illegal GPS tracker on defendant's vehicle before obtaining a warrant to do so. *See, e.g.*, ECF 1003 at 4, 7, 8. As discussed, this argument is based on a misreading of the warrant application of October 11, 2017, and consists of pure speculation. It does not rise anywhere close to the "egregious circumstances" in *Fisher*, 711 F.3d at 469, in which a police officer admitted and pled guilty to lying about the confidential informant cited in his affidavit.

At still other points, Smith suggests that the government's misrepresentation was not disclosing the broader, GTTF-related misconduct by Jester that he alleges above. *See, e.g.*, ECF 1003 at 2, 3, 5, 7. Even assuming defendant's allegations are true, this does not provide a basis to vacate defendant's guilty plea. As an initial matter, it is undisputed that the government *did* inform defense counsel as to the investigation into Jester prior to Smith's plea of guilty. *See* ECF 978-1, ¶ 13; ECF 1003-1, ¶ 3. By Smith's own admission, this appears to be all that occurred prior to his guilty plea. *See* ECF 1003 at 5 ("Over a year after Defendant pled guilty, between 2020 and 2021, Agent Jester was suspended for wrongdoing and indicted in federal court (trial is pending).").

Under *Fisher*, if Jester's actions constituted impermissible misconduct in Smith's case, this might be sufficient to invalidate Petitioner's plea even if the conduct was not discovered until after the guilty plea. But, *Fisher* concerned "egregious" and "highly uncommon . . . gross police misconduct" that went "to the heart of the prosecution's case" against Fisher himself. *Id*. at 466, 469. The case "involved misconduct relating to the evidence underlying the charges to which [Fisher] pled guilty." *United States v. Cohen*, WDQ-14-0310, 2015 WL 5331697, at *7 (D. Md. Sept. 10, 2015) (summarizing *Fisher*). The Fourth Circuit did not suggest that unrelated instances of alleged misconduct are sufficient to invalidate a guilty plea.

Indeed, the Maryland Court of Appeals, applying the federal Constitution and analyzing *Brady v. United States* and *Fisher*, recently rejected the argument that "undisclosed evidence of police misconduct wholly unrelated to a defendant's case can be so critical to the defense that it renders the guilty plea involuntary." *Byrd v. State*, 471 Md. 359, 383, 241 A.2d 913, 927 (2020).

Of course, *Byrd* is not binding on this Court.  But, I find its analysis persuasive.  The Maryland Court of Appeals stated: "[V]acating a guilty plea in a case that an officer was involved with based upon wholly unrelated conduct weighing solely on the officer's general credibility is simply too blunt a tool to use in support of [the] goal" of "deterring police misconduct."  *Id.* at 381, 241 A.2d at 926.

Several other courts have likewise found that *Fisher* does not apply where the information allegedly withheld from the defendant is impeachment evidence with little or no connection to the defendant's own case.  *See, e.g., Coats v. United States*, RDB-09-333, 2018 WL 1570241, at *5-*6 (D. Md. Mar. 30, 2018) (declining to apply *Fisher* where "[m]ultiple officers were involved in the observations and investigations that led to [the petitioner's] conviction"); *Carmon v. United States*, 4:12-cr-99-FL-1, 2015 WL 5838634, at *3 (E.D.N.C. Oct. 7, 2015) (distinguishing *Fisher* and denying petitioner's claim for relief based on police misconduct where "petitioner ma[de] no allegation as to any connection between such criminal conduct and the prosecution in [petitioner's] case"); *Richardson v. United States*, 4:11-cr-110-FL, 2015 WL 4366198, at *4 (E.D.N.C. July 16, 2015) ("Unlike in *Fisher*, petitioner has not alleged that the criminal conduct by [the officer] related specifically to the police investigation that underpinned the government's evidence in this case.  In this manner, petitioner has not alleged exculpatory evidence so extraordinary as to undermine the knowing and voluntary nature of his plea."); *Lewis v. United States*, 4:12-cr-00068, 2015 WL 2401514, at *9 (E.D.N.C. May 20, 2015) (distinguishing *Fisher* where criminal charges

against an officer involved in the petitioner's arrest "d[id] not permit an inference of a connection to this case" and therefore constituted impeachment evidence that the government was not required to disclose prior to petitioner's guilty plea).

The final possibility for government misrepresentation is Smith's claim that the SOI was fabricated entirely, and that the government lied even in the assertion that the SOI was Coconspirator 1.  *See, e.g.*, ECF 1003 at 7; ECF 1040 at 3-5, 14.  This still does not provide a basis for Petitioner's claim.  Again, *Fisher* involved a situation in which the affiant "himself pled guilty to fraud and theft offenses and admitted that the confidential informant he identified in his affidavit 'had no connection to the case.'"  711 F.3d at 466.  No such circumstances are present here.

As noted, most of the arguments offered by Smith as to why Coconspirator 1 could not have been the SOI (*see, e.g.*, ECF 756-1 at 16-17; ECF 1040 at 6) are essentially speculation, or an unconvincing parsing of language in warrant applications.  In his reply, Petitioner has also submitted—a year and a half after first filing the Petition—the Affidavit of Coconspirator 1.  *See* ECF 1040-2.  Smith leans heavily on this in the reply, arguing that in the Affidavit, Coconspirator 1 "swore under penalties of perjury, that he in fact was not the 'S.O.I.' in the original warrant," and that the Affidavit proves that the SOI was a fabrication.  ECF 1040 at 5.

The Court does not read the Coconspirator 1 Affidavit the same way.  As I described it during the motion hearing, the Tracking Warrant Affidavit averred that the SOI "informed investigators that the phone number in issue was for a male *known to him only as Pee* and that Pee is 'the source of supply' for [Coconspirator 1] and the Transformers heroin shop."  ECF 681 at 39 (emphasis added); *see also* ECF 253-1 at 8.  That is, the Tracking Warrant Affidavit did not state that the SOI identified the Phone Number as belonging to Patrick Smith.  Instead, the SOI referred only to "Pee."  Investigators then had to determine that "Pee" was Patrick Smith.

In his Affidavit, Coconspirator 1 does *not* claim that he was *not* the SOI referenced in the Tracking Warrant Affidavit.  Instead, he avers: "I did not make any identification of the number and text messages in my phone *as my drug supplier Patrick Smith* until at least a month after I was arrested."  ECF 1040-2 at 2 (emphasis added).  But, critically, Coconspirator 1 does not dispute that he identified his supplier as "Pee."  Equally significant, and as I observed earlier, Jester never claimed in his Affidavit that the SOI identified the supplier as Patrick Smith.

In sum, the circumstances here fall far short of the those in *Fisher*.  As much as Petitioner paints each assertion he makes as definitive proof that the content of the Tracking Warrant Affidavit was a fabrication, he has not come anywhere close to making his case.

*Fisher* is inapposite in other ways.  In *Fisher*, the information supposedly provided by the confidential informant was central to the issuance of the search warrant.  *See* 711 F.3d at 462-63, 468-69.  Conversely, in this case, as I have already ruled, the Tracking Warrant was supported by probable cause, even without the SOI.  *See* ECF 681 at 39-44.  In addition, crucial in *Fisher* was that the knowledge of Lunsford's misrepresentation would have changed the defendant's "'entire approach'" to the case.  711 F.3d at 467 (internal citation omitted).  *Fisher*'s defense counsel had advised the defendant to plead guilty in part because she thought there were no grounds to challenge the warrant.  But, with knowledge of the misrepresentation, counsel would have filed a motion to suppress and challenged Lunsford's credibility at trial.  *Id.* at 466-69.

Here, Smith and his counsel already had serious doubts as to the viability of the Tracking Warrant and the credibility of Jester, which was one of the reasons the defense filed the Motion to Suppress in the first place.  *See, e.g.*, ECF 754-2, ¶¶ 4-9, 11; ECF 758-1, ¶¶ 8-12, 15.  In sum, Smith's argument that, under *Fisher*, his plea was not knowing and voluntary falls short.

### 3.   Other Arguments

Smith's two additional arguments in Amendment Three—premised on *Brady v. Maryland*, 373 U.S. 83, and ineffective assistance of counsel—are also not persuasive.  As discussed, the *Brady v. Maryland* argument appears to be that the government violated its disclosure obligations by not informing the defense of the "investigation as well as the suspension" of Jester due to his alleged wrongdoing in other cases, as well as that underlying wrongdoing.  ECF 1003 at 1.

"Generally, a criminal defendant who pleads guilty 'may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.'"  *Dicks v. Bishop*, GLR-17-3667, 2019 WL 6878985, at *3 (D. Md. Dec. 17, 2019) (quoting *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)).  However, "several federal circuit courts have allowed a defendant to argue that a 'guilty plea was not voluntary and intelligent because it was made in the absence of withheld *Brady* [*v. Maryland*] material.'"  *Id.* (quoting *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995)) (collecting cases) (alteration mine).  But, there are multiple problems with this claim.

In *Brady v. Maryland*, 373 U.S. at 87, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Notably, "a *Brady* violation contains three elements: the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial."  *Nicolas v. Attorney General of Md.*, 820 F.3d 124, 129 (4th Cir. 2016); *see also United States v. Taylor and Hersl*, 942 F.3d 205, 225 (4th Cir. 2019); *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003).  At least in the trial context, there is "no distinction between exculpatory and

impeachment evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Taylor and Hersl*, 942 F.3d at 225; *Nicolas*, 820 F.3d at 129.

Because Smith is referring to information as to Jester's alleged wrongdoing in other cases, his claim concerns impeachment evidence, rather than exculpatory evidence.[17]  To my knowledge, the Fourth Circuit has not yet clarified "whether there exists a *Brady* right to pre-plea disclosure of exculpatory evidence." *Dicks v. Bishop*, GLR-17-3667, 2019 WL 6878985, at *3 (D. Md. Dec. 17, 2019).[18]  However, the Supreme Court has squarely held that *Brady v. Maryland* does not require the pre-plea disclosure of impeachment evidence.  *United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.").

And, the Fourth Circuit has commented, more broadly: "The *Brady* right, however, is a *trial* right.  It requires a prosecutor to disclose evidence favorable to the defense if the evidence is material to either guilt or punishment, and exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty. . . . When a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted." *Moussaoui*, 591 F.3d at 285 (emphasis in original); *see also, e.g.*, *United States v. Richards*, 314 Fed. App'x 522, 525 (4th Cir. 2008) ("The failure to disclose *Brady* evidence prior to a guilty plea does not

---

[17] Arguably, even if Smith's claim concerned Jester's alleged misconduct in his own case, rather than others, it would be impeachment evidence. Smith's argument as to Jester's alleged misconduct  is that it undermined the Tracking Warrant Affidavit and Jester's credibility, not that it would show his innocence.

[18] Smith's plea and sentencing occurred prior to the enactment of the Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (2020), on October 21, 2020. This law amended Fed. R. Crim. P. 5(f) to require that, "on the first scheduled court date when both prosecutor and defense counsel are present" the court must "issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation under *Brady v. Maryland*," and the consequences of violating such an order.  *Id*. § 2.

establish a constitutional violation because impeachment information is a safeguard for a fair trial, not a plea."); *Jones v. Cooper*, 311 F.3d 306, 315 n.5 (4th Cir. 2002) ("To the extent appellant contends that he would not have pled guilty had he been provided the information held by the jailor, this claim is foreclosed by [*Ruiz*].").[19]  Again, the Maryland Court of Appeals persuasively discussed this issue in *Byrd*, 471 Md. at 372-77, 241 A.3d at 921-24, and affirmed that under *Brady v. Maryland* and *Ruiz* there is no pre-guilty plea right to impeachment evidence as to unrelated police misconduct.

Even if *Brady v. Maryland* applied, it is hardly clear that a violation occurred.  A *Brady* claim generally involves evidence withheld by the prosecution.  *See Nicolas*, 820 F.3d at 129; *Moussaoui*, 591 F.3d at 285.  Here, however, it is undisputed that the government informed defense counsel of the investigation into Jester prior to Smith's guilty plea.  *See* ECF 978-1, ¶ 13; ECF 1003-1, ¶ 3.  Insofar as the claim is that the government did not disclose further discipline or action against Jester, Smith has recognized that legal action involving Jester occurred *after* defendant's guilty plea.  *See* ECF 1003 at 5 ("Over a year after Defendant pled guilty, between 2020 and 2021, Agent Jester was suspended for wrongdoing and indicted in federal court (trial is pending).").  I am not aware of any authority for the proposition that the government has an obligation to provide exculpatory or impeachment evidence to a defendant that comes into existence after the defendant has been convicted and sentenced, particularly when there is no claim by a petitioner of actual innocence.

Finally, if the claim is that knowledge of the specific details of Jester's alleged wrongdoing in other cases could have been imputed to the prosecution in this case (*see* ECF 1040 at 13), this argument is dubious in light of Fourth Circuit precedent.  In *United States v. Robinson*, 627 F.3d

---

[19] Smith does not advance a claim of actual innocence. *See* ECF 1003 at 7.

941 (4th Cir. 2010), the Fourth Circuit determined that although "the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness," *Brady v. Maryland* does not "require [prosecutors], on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case." *Id*. at 951-52.

Smith's third argument is that Mr. Purpura was ineffective for allegedly telling Smith that if there was a "substantial finding or guilty verdict" against Jester, then Petitioner could "have his plea withdrawn." ECF 1003 at 1. This argument is presented for the first time in Amendment Three in a vague and purely conclusory fashion. *See id*. at 1-2, 7. At the plea hearing, however, Smith explicitly indicated that he understood that, by pleading guilty, he "waive[d] any and all objections or challenges that [he] might have to any aspect of the investigation and prosecution of this case." ECF 682 at 38.

As stated, "a defendant's solemn declarations in open court affirming a [plea] agreement . . . 'carry a strong presumption of verity.'" *Lemaster*, 403 F.3d at 221 (quoting *Blackledge*, 431 U.S. at 74). Furthermore, Smith's ad hoc assertion that this alleged advice by Mr. Purpura caused him to accept the Plea Agreement, rather than go to trial, is again, at best, self-serving and conclusory. *Lee*, 137 S. Ct. at 1967 ("Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have [pled] but for his attorney's deficiencies."). Under the circumstances, I reject this argument as well. Therefore, the arguments in Amendment Three lack merit.

### C. Amendment Four (ECF 1008)

In Amendment Four, Smith makes two additional ineffective assistance of counsel arguments. *See* ECF 1008. Smith asserts that he received ineffective assistance of counsel because

Purpura informed him that he would be eligible to receive a one-year deduction in his sentence upon completing the Residential Drug Assistance Program ("RDAP"), and he relied on this "misrepresentation" in deciding to plead guilty. *Id*. at 1.  In his reply, Smith has included BOP documentation, dated April 16, 2021, indicating that he is ineligible for the one-year deduction based on various aspects of his conviction. *See* ECF 1040-5.

Smith's Plea Agreement specifically provided, ECF 56, ¶ 15: "There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement."  Smith affirmed, at the plea hearing, that apart from the Plea Agreement, no other promises or assurances had been made to him. ECF 682 at 39.  And, the Plea Agreement contained no promises or commitments at to Smith with regard to the RDAP program.  Therefore, to the extent that Mr. Purpura misinformed Smith as to his eligibility for an RDAP deduction, this misinformation was cured by the Court. *See Mayhew*, 995 F.3d at 179-80.

Furthermore, as noted, "Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have [pled] but for his attorney's deficiencies." *Lee*, 137 S. Ct. at 1967.  Therefore, "to prevent criminal defendants with bargainer's remorse from simply claiming they would not have taken a deal but for a bit of bad advice," the defendant must "provide evidence of [his] sincerity." *Murillo*, 297 F.3d at 816.  Smith has provided absolutely no evidence of his sincerity, merely a post hoc, conclusory assertion.  And, as I have noted, Smith's sentence was a "gift" and "extremely lenient," especially compared to the exposure Petitioner faced if he had he gone to trial and had been convicted. ECF 684 at 23-24, 29-30.  Indeed, as the government accurately notes, and as I discussed above: "Had Smith gone to trial, he faced a mandatory

minimum of 15 years' imprisonment, and a maximum of life imprisonment, based on the combined sentences for the § 846 and § 924(c) offenses." ECF 1031 at 6.

In this context, in order to show prejudice, much more is required of Smith to demonstrate that a potential one-year reduction in his sentence for completion of the RDAP program was a determining factor in his decision to accept a plea that spared him a far more significant prison term. *See, e.g.*, *United States v. Ramirez-Hernandez*, No. 5:08-CR-112-KKC, 2012 WL 1940681, at *7 (E.D. Ky. Apr. 16, 2012) ("[T]he notion that Defendant would have refused to plead over RDAP eligibility is not credible. . . . Ramirez–Hernandez got a deal that spared him the mandatory minimum and resulted in a sentence four years below that ten year floor. To think he would have elected to go to trial, facing that penalty, over not getting RDAP and the chance to shave one year from any term simply does not qualify as 'rational' under the cases.") (internal citation omitted); *Flynn v. United States*, No. 2:08-cr-772, 2011 WL 6339784, at *6 (D. Utah Dec. 19, 2011) ("There is no evidence in the record that RDAP was the driving force behind Flynn's counsel's recommendation that Flynn accept the plea agreement. Instead, the recommendation was based on Flynn avoiding a ten-year minimum mandatory sentence.").[20]

Smith also asserts in Amendment Four that Mr. Purpura was ineffective for misinforming him that he would be subject to the career offender enhancement if he was found guilty of the § 846 drug conspiracy. ECF 1008 at 1. As the government notes (ECF 1031 at 7), this argument is somewhat difficult to understand, because no career offender enhancement was applied to Smith. In the reply, Smith clarifies that he means that if Mr. Purpura had "correctly informed" him as to

---

[20] Smith received the mandatory minimum for the § 846 charge to which he pled guilty, but as the government points out (ECF 1031 at 6), the combination of charges he would have faced at trial could have resulted in a greater mandatory minimum.

the career offender issue, "Smith could very well have gone to trial in this case, due to knowing that the could not be career [sic] out or receive a life sentence." ECF 1040 at 16.

This contention fails for at least two reasons. First, Smith cites *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019), which held that an § 846 drug conspiracy conviction is not a "controlled substance offense" for the purposes of a career offender enhancement under U.S.S.G. § 4B1.1. *See id.* at 237-39. Assuming the applicability of *Norman* to a case like Petitioner's, *Norman* was not decided until August 15, 2019—three months *after* Smith's guilty plea. And, a claim of ineffective assistance is evaluated in light of "the strength of case law as it existed at the time of allegedly deficient representation." *Palacios*, 982 F.3d at 924. Therefore, Mr. Purpura could not have been deficient for advising Smith to accept the guilty plea on this basis.

Second, as noted, even aside from a career offender enhancement, Smith could have received a life sentence for his § 846 offense. Smith was charged with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, which carries a maximum term of life imprisonment under 21 U.S.C. § 841(b)(1)(A)(i); *see also* ECF 563, ¶ 3 (noting maximum sentence of life imprisonment for Smith's § 846 offense); ECF 682 at 14 (indicating the same during the plea colloquy). Thus, the assertion that the possibility of career offender status and a resulting life sentence impacted Smith's decision to plead guilty strains credulity. Accordingly, Amendment Four does not provide a basis to grant the Petition.

### D. Amendment Five (ECF 1020)

Amendment Five presents a further grab-bag of ineffective assistance of counsel claims. *See* ECF 1020 at 1-3.   None have merit.

First, Smith repeats his career offender argument from Amendment Four. This must be rejected, for the reasons set forth above. Similarly, Smith asserts that Mr. Purpura was ineffective

for erroneously calculating Petitioner's Sentencing Guidelines on the basis of career offender status, and then misinforming Smith as to this Guidelines calculation. *Id*. at 1-2. This supposedly contributed to Smith's decision to plead guilty. *Id*. This contention fails for the same reasons as the first career offender argument.

Next, Smith contends that Mr. Purpura was ineffective for "not objecting and informing the Court" that Smith could not have entered into an § 846 conspiracy with Coconspirator 1 relating to one kilogram or more of heroin. *Id*. This is because Coconspirator 1 entered into a plea agreement on March 4, 2019, *i.e.*, before Petitioner did, under which he agreed to a sentence of 108 months of imprisonment, which is less than the ten-year mandatory minimum for the offense. *Id*. In other words, Smith argues that he "could not have conspired" with Coconspirator 1 because Coconspirator 1 received less than the mandatory minimum for an § 846 conspiracy offense. ECF 1020 at 2. But, the length of sentence of a coconspirator is not an element the government must prove to establish either the drug quantity foreseeable to Smith or the existence of an § 846 conspiracy. *See United States v. Strickland*, 245 F.3d 368, 384-84 (4th Cir. 2001) (outlining the § 846 elements). So, it was not deficient performance for Mr. Purpura to fail to object along the lines Smith asserts. In addition, although Coconspirator 1 pled guilty on March 4, 2019, he was not actually sentenced until July 31, 2019, several months after Smith pled guilty. ECF 625.

Finally, Smith argues that Mr. Purpura was ineffective for "not objecting" regarding the sentencing disparity between Smith and Coconspirator 1. ECF 1020 at 1-2. To a large extent this appears to duplicate the argument above, and so it must be rejected for the same reasons. In addition, Smith and Coconspirator 1's cases were different, and any number of factors could have influenced the modestly shorter sentence Coconspirator 1 received as compared to Smith—for example, his asserted cooperation with the government. Finally, as I noted during Petitioner's

sentencing hearing, a number of codefendants in this case received substantially greater sentences than Smith.  ECF 684 at 23-24.  In sum, these claims fail.

### E. Amendment Six (ECF 1022)

Smith's last amendment makes a number of additional claims, which are not always easy to understand.  *See* ECF 1022.  Several relate to a claim that, by relying on information from the SOI, the government made use of information from an individual who had violated a "confidential informant agreement," without disclosing the conduct.  ECF 1022 at 2.  Smith appears to argue that this behavior by the government was improper, and that Mr. Purpura was ineffective for failing to raise this issue at the Motion to Suppress hearing.

The allegation of a confidential informant agreement that was violated in some way is vague, cursory, and unaccompanied by any evidence or documentation.  And, "'vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.'"  *Dyess*, 730 F.3d at 359 (internal citation omitted).  Moreover, to the extent that in this contention Smith appears to assert that Coconspirator 1 violated a confidential informant agreement, this allegation would seem to contradict his previous arguments that Coconspirator 1 was not the SOI at all.

As discussed, when claiming ineffective assistance based on a failure to move to suppress evidence, the court asks "whether the 'unfiled motion would have had some substance.'"  *Pressley*, 990 F.3d at 388 (quoting *Grueninger*, 813 F.3d at 524-25).  And, "[t]o satisfy the prejudice prong, the defendant must show that: (1) 'the [suppression] motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial.'"  *Id*. (quoting *Grueninger*, 813 F.3d at 525) (alteration in *Pressley*).  Here, it is unclear if a suppression argument based on Smith's confidential informant agreement allegation

would have had any substance.  But, even if it did, the motion would not likely have been granted, because the Court held that the Tracking Warrant was supported by probable cause, even without considering the SOI.

Finally, Amendment Six argues that Mr. Purpura was ineffective because he told Smith that he felt that the Court made the correct decision regarding the Motion to Suppress and that Smith did not have any grounds to appeal this ruling, and because he refused to file a notice of appeal as Smith had requested.  ECF 1022 at 2, 4.  The allegation as to failure to appeal has already been discussed, *supra*.  And, although this Court is hardly infallible, I am not prepared to accept that it constitutes deficient performance to opine that a decision by this Court may have been correct.  I will deny the claims in Amendment Six.

## VI. Conclusion

In summary, I will grant each motion to amend the Petition.  However, even as amended, none of the claims asserted in the Petition have any merit.  Therefore, I shall deny the Petition.

No evidentiary hearing is necessary to evaluate the claims in the Petition.  Therefore, I will deny the motion for an evidentiary hearing.  ECF 932.  And, I will deny Petitioner's motion for oral argument at the § 2255 hearing (ECF 931), as well as his motion to subpoena certain witnesses for an evidentiary hearing.  ECF 930.  These motions are moot given that the Court will not hold an evidentiary hearing,

## VII. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.  A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order.  *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).  In other words, unless a COA is

issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017).  Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong.  *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

I do not find that Smith has made a substantial showing of the denial of a constitutional right as to any of his claims.  Therefore, I shall decline to issue a COA.[21]

An Order follows, consistent with this Memorandum Opinion.

Date: April 29, 2022                             _____/s/_____

Ellen L. Hollander
United States District Judge

---

[21] Where the district court denies a COA, this does not preclude a petitioner from seeking a COA from the appellate court.